CLEVELAND CONSTRUCTION, INC., Appellant,

v.

OHIO DEPARTMENT OF ADMINISTRATIVE SERVICES,
GENERAL SERVICES ADMINISTRATION, Appellee.

[Cite as *Cleveland Constr., Inc. v. Ohio Dept. of Adm. Serv.,
Gen. Serv. Adm.* (1997), 121 Ohio App.3d 372.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 96APE05–686.

Decided June 10, 1997.

374

376

*Arter & Hadden, Peter D. Welin, Michael W. Currie* and *Laura A. Hauser*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Jerry Kasai*, Assistant Attorney General, for appellee, Department of Administrative Services, General Services Administration.

*Keggler, Brown, Hill & Ritter, Donald W. Gregory, Stephen E. Chappelear* and *Christopher J. Weber*, Special Counsel for Betty D. Montgomery, for intervenor Ohio State University.

*Buckingham, Doolittle & Burroughs* and *Donald B. Leach, Jr.*, for intervenor-appellee Danis Building Construction Company.

*Schottenstein, Zox & Dunn* and *Roger L. Sabo*, for amicus curiae, Associated General Contractors of Ohio.

---

JOHN C. YOUNG, Judge.

This matter is before this court upon the appeal of Cleveland Construction, Inc. ("Cleveland"), appellant, from the May 7, 1996 judgment entry of the Franklin County Court of Common Pleas. The history of this case is as follows: Cleveland is an Ohio corporation that submitted a bid to complete Phase I of a public works project known as the Max M. Fisher College of Business ("Fisher Project") at the Ohio State University. The Department of Administrative Services ("DAS") is an agency for the state of Ohio that acts as the contracting authority for the state on public construction projects. The Ohio State University ("OSU") is the agency that will occupy the project once it is completed.

In February 1996, DAS sought to procure bids for the Fisher Project. As part of the contract documents which potential bidders received, DAS included its "Standard Conditions of Contract for Construction," which further contained "Instructions to Bidders." Sections 3.5.3 and 3.5.4 of the Instructions to Bidders provide information pertinent to the determination of whether a bidder is a "responsible" bidder and lists the factors set forth in R.C. 9.312. R.C. 9.312 provides that a contract will be awarded to the lowest responsive and responsible bidder.

Cleveland submitted a base bid for the "general trades" portion of the project in the amount of $22,898,000. Cleveland further submitted bids for alternates one through fourteen, bringing the total base bid, plus alternates, to $24,421,000. The other apparent low bidders on the project were appellee Danis Building Construction Company ("Danis") and Dick Construction ("Dick"). The base bid submitted by Danis for the general trades portion of the project was $23,278,000, and the base bid for the general trades portion of the project submitted by Dick was $22,987,000.

At the February 21, 1996 bid opening, both Jill Morelli and Chuck Hamilton, who represented the OSU Architect's Office at the bid opening, raised concerns about prior work that Cleveland had performed on OSU's campus. Morelli's concern stemmed from the work Cleveland performed as the interior packages contractor on the building which is currently occupied by Morelli and the OSU Architect's Office. The parties dispute whether Cleveland failed to complete several punch list items. Hamilton's concern stemmed from the fact that he understood Cleveland to be an interior packages construction company, and did not know whether Cleveland had ever performed as the lead contractor on a public works project of the scope and complexity of the Fisher Project. At trial, Tom Poulton, the Project Administrator for the Office of Construction Management of DAS, expressed a similar concern.

Subsequent to the submission of the bids, Morelli recommended to DAS that two apparent low bidders be announced, namely Cleveland and Dick, because the decision as to which alternates to accept had not yet been determined. Thereafter, OSU made its decision to accept all of the general trades contract alternatives. Thus, Cleveland was the apparent low bidder and Danis was the second low bidder.

On or about March 4, 1996, Morelli met with counsel for DAS to discuss conducting a responsibility investigation as contemplated under R.C. 153.08 and 9.312. Morelli sent a letter to Randy Fischer of the office of State Architect/Engineer, requesting that additional information be obtained from each of the prime contractors that had submitted bids for the Fisher Project, including the three lead general contractors. An investigation to determine whether Cleveland, Danis, and Dick were responsible bidders for the project was conducted as set forth below.

On March 5, 1996, the deputy director for DAS, George Kaitsa, sent a letter to nine contractors requesting that they submit information on the following criteria:

"(1) experience of the bidder, including a list of recent public projects completed of a similar nature. Mr. Kaitsa asked the contractors to indicate the scope and value of their contracts and the name of an owner representative for a reference;

"(2) financial condition of the bidder, including a certified financial statement;

"(3) conduct and performance of the bidder on previous contracts, including any prevailing wage complaints, EEOC regulation issues or citations from EPA, OSHA or other regulating entities;

"(4) facilities of the bidder; and,

"(5) management skills of the bidder."

Kaitsa indicated that as to numbers four and five, the bidders could submit any information they deemed relevant to these factors. Cleveland received Kaitsa's March 5 letter and responded accordingly. Prior to its response, Cleveland did not contact DAS to request any direction or assistance in responding to this letter.

Morelli also formed a committee to review the information submitted in response to Kaitsa's March 5 letter. The members of the committee were as follows: Greg Honzo, a representative of Gilbane Building Company, the construction manager for the Fisher Project; Dick Carpenter, a representative of Karlsberger & Company, the associate architect for the project; and Hamilton.

Between March 5 and March 18, 1996, the committee conducted an analysis of the bidders that submitted bids for the project using the information submitted by the bidders in response to Kaitsa's March 5 letter. The committee developed a series of standardized questions to ask the bidders about their experience, financial condition, conduct and performance on prior contracts, facilities and management skills. The committee also conducted a series of reference checks using projects submitted by the various bidders. Honzo performed reference checks for those contractors that bid to serve as the lead contractor on the Fisher Project. It should be noted that reference checks were also performed for some of the other contractors on the project, even though they would not serve as the lead contractor.

Honzo contacted representatives of the RTA Bus Garage Project in Cleveland, Ohio, and the Design Architecture and Art Planning Project ("DAAP") at the University of Cincinnati. Honzo testified that he chose not to contact Cleveland's private references, simply because those projects were retail in nature and were in no way comparable in scope and complexity to the Fisher Project. It should be noted that several of the references for these private projects were contacted later by Kaitsa when he conducted his independent investigation, after the protest meeting.

As a result of their investigation, the committee and OSU ultimately made a recommendation to DAS that Cleveland be found not responsible and that Danis be awarded the contract. The results of the committee's investigation are contained in the March 19, 1996 letter to Deputy Director George Kaitsa, which, although signed by Morelli, was drafted by the committee members. On or about March 20, 1996, Morelli and Kaitsa met to discuss the results of the committee's investigation. Kaitsa reviewed the committee's results and further reviewed a spreadsheet prepared by the committee.

Kaitsa testified that at that time he did not conduct an independent investigation but, rather, relied on the findings of the committee. At that time, Kaitsa simply reviewed the process undertaken by the committee in conducting its

responsibility investigation. Kaitsa testified that he did not see any problem with the process and, for that reason, made his recommendation to the director of DAS, Sandra Drabik, that Cleveland be found not responsible. Drabik concurred with Kaitsa's recommendation that Cleveland be found not responsible for the Fisher Project, and further agreed that the general trades contract be awarded to Danis as the next low bidder. On March 22, 1996, DAS notified Cleveland of its decision.

Thereafter, on or about March 27, 1996, Cleveland requested a protest meeting pursuant to R.C. 9.312(B). On April 2, 1996, a protest meeting was conducted, and Cleveland was given the opportunity to present additional information to attempt to refute the determination that Cleveland was not a responsible bidder for the Fisher Project. The April 2 protest meeting was transcribed by a court reporter and is contained within the record. At that meeting, Cleveland was not permitted to question any of the committee members, as they were not present, nor was Cleveland permitted to cross-examine any witness.

Following the April 2 meeting, Kaitsa conducted his own independent investigation. He investigated Cleveland's financial status, experience on similar projects, management skills, and overall ability to execute the contract properly. Kaitsa further testified that he reviewed all of the information provided by Cleveland at the April 2 meeting, the results of the investigation performed by the committee, and his own reference checks, which included several of the private reference checks that Cleveland had submitted. After performing this independent investigation, Kaitsa recommended to Drabik that Cleveland be found responsible with respect to its financial condition, but not responsible with respect to experience, management skill, past performance on other contracts, and an overall ability to execute the contract properly. On April 5, 1996, Drabik informed Cleveland that DAS was affirming its earlier decision insofar as DAS found that Cleveland was not a responsible bidder for the Fisher Project. It should be noted that the prior determination that Cleveland was not financially responsible was reversed after Kaitsa's independent investigation.

On April 12, 1996, DAS issued its notice of award to Danis. On or about April 18, 1996, Danis received its notice to proceed and began mobilizing equipment and moving forward with construction. Danis also acquired performance bonds and liability insurance and made commitments to various subcontractors and suppliers, all at an estimated cost of $500,000 prior to the conclusion of the trial. Construction on the Fisher Project has been proceeding since the time Danis received its notice to proceed.

Before Danis received its notice to proceed, Cleveland filed its verified complaint seeking injunctive and declaratory relief. Cleveland sought to enjoin DAS from awarding, executing, or beginning performance of the contract for the

general trades portion of Phase I of the Fisher Project. Cleveland also moved for a temporary restraining order, which was subsequently denied. The trial court consolidated the hearing on the preliminary injunction with the trial on the merits. The trial was held from April 25 to April 30, 1996. On May 7, 1996, the trial court issued its findings of fact and conclusions of law, along with its judgment entry. The court dismissed the complaint and denied Cleveland's request for declaratory and injunctive relief. Cleveland timely appealed and on appeal asserts the following assignments of error:

"1. The trial court erred when it denied Appellant's request for declaratory relief.

"2. The trial court erred when it denied Appellant's request for injunctive and/or declaratory relief on the grounds that Appellee Ohio Department of Administrative Services ('ODAS') had abused its discretion.

"3. The trial court erred when it denied Appellant's request for injunctive and/or declaratory relief on the grounds that ODAS had failed to legally promulgate rules and/or regulations to govern its determination of Appellant's responsibility as a bidder.

"4. The trial court erred when it denied Appellant's request for injunctive and/or declaratory relief on the grounds that ODAS utilized illegal rules, not legally promulgated, to find that Appellant was not a responsible bidder.

"5. The trial court erred when it denied Appellant's request for injunctive and/or declaratory relief on the grounds that Ohio Revised Code Section 9.312 is unconstitutionally vague.

"6. The trial court erred when it utilized the wrong standard for 'abuse of discretion' in the context of public competitive bidding in making its determination that Appellant was not entitled to the relief requested.

"7. The trial court erred when it held that R.C. 9.312 is not subject to Ohio Revised Code Chapter 119.

"8. The trial court erred when it failed to find that ODAS's use of its 'front-end documents' to establish rights and obligations of parties who contract with the State of Ohio are rules which must be duly promulgated in accordance with law.

"9. The trial court erred in finding that the 'Committee' who undertook the non-responsibility investigation of Appellant was doing so for and on behalf of ODAS.

"10. The trial court erred in finding that the protest meeting contemplated by R.C. 9.312 and conducted in this case did not violate Appellant's rights under Ohio law, the Ohio Constitution and/or the United States Constitution.

"11. The trial court erred in finding that the criteria set forth in R.C. 9.312 to be applied in determining whether a contractor is responsible are announced, clear and reasonable.

"12. The trial court erred in finding that the procedures applied in determining 'responsibility' under R.C. 9.312 and ODAS's Instructions to Bidders are not subject to the rulemaking process set forth in Chapter 119 of the Ohio Revised Code.

"13. The trial court erred in finding that ODAS fully complied with R.C. 9.312 and R.C. 153.08 in determining that Appellant was not a responsible bidder.

"14. The trial court erred in finding that the process used by ODAS in evaluating bidders pursuant to the criteria set forth in R.C. 9.312 was fair and reasonable.

"15. The trial court erred in finding that ODAS and Intervenor–Appellee The Ohio State University had the unbridled discretion to accept another bid or reject all bids when either party determined it would not be in the best interest of the State to award to the lowest responsive bidder pursuant to § 3.4.4 of the Instructions to Bidders and R.C. 153.09.

"16. The trial court erred in finding that the contract entered into between ODAS and Intervenor–Appellee Danis Building Construction Company is not void, *ab initio.*

"17. The trial court erred in allowing Intervenor–Appellees The Ohio State University and Danis Building Construction Company to intervene."

 In the instant action, Cleveland seeks review of two types of claims in this matter: claims for declaratory judgment and claims for injunctive relief. The granting of declaratory relief and the issuance of an injunction are matters of judicial discretion that will not be disturbed on appeal absent an abuse of discretion by the trial court. *Control Data Corp. v. Controlling Bd.* (1983), 16 Ohio App.3d 30, 35, 16 OBR 32, 36–38, 474 N.E.2d 336, 341–342. It is well established that courts should take "[p]articular caution in granting injunctions, especially in cases affecting a public interest where the court is asked to interfere with or suspend the operation of important works or control the action of another department of government." See *Leaseway Distrib. Ctrs., Inc. v. Ohio Dept. of Adm. Serv.* (1988), 49 Ohio App.3d 99, 106, 550 N.E.2d 955, 962.

 Moreover, the proof necessary to support the granting of an injunction must be clear and convincing, and the right thereto must be clear and established by the strength of Cleveland's own case and not by the weakness of appellees' case. See *W.C.I./Waltek v. Ohio Bldg. Auth.* (Aug. 4, 1994), Franklin App. No. 93APE11–1583, unreported, 1994 WL 409780, citing *White v. Long* (1967), 12

Ohio App.2d 136, 140, 41 O.O.2d 200, 202–203, 231 N.E.2d 337, 340. As noted by this court in *Waltek, supra,* an unsuccessful bidder may bring an action for injunctive relief against a contracting authority when it is alleged that a contract was unlawfully awarded to another bidder.[1]

However, to prevail on a complaint seeking injunctive relief with respect to the award of a public contract, Cleveland must prove by clear and convincing evidence that the award constituted an abuse of discretion and resulted in some tangible harm to the public in general, or to Cleveland individually. In this context, abuse of discretion has been defined as an unreasonable, arbitrary or unconscionable attitude. *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 552 N.E.2d 202.

In its second, thirteenth, and fourteenth assignments of error, Cleveland argues that it is entitled to injunctive relief because of the arbitrary nature of DAS's use of unannounced and unlawful criteria to determine responsibility. We disagree. R.C. 9.312(A) provides:

"The factors that the state agency or political subdivision shall consider in determining whether a bidder on the contract is responsible include the experience of the bidder, his financial condition, his conduct and performance on previous contracts, his facilities, his management skills, and his ability to execute the contract properly."

R.C. 9.312, as well as the Instructions to Bidders, sets forth several factors that must be considered in an effort to determine responsibility. Cleveland takes issue with several "unannounced" criteria, which Cleveland claims were created to put Cleveland in as bad a light as possible. Cleveland first points to Kaitsa's request that Cleveland submit certified financial statements. It should be noted that this request was made of several bidders: Cleveland was by no means singled out. Clearly, a certified financial statement would be helpful in determining a bidder's financial condition. Thus, we do not find that this constitutes "unannounced" criteria, given that R.C. 9.312(A) specifically lists financial condition as a factor to be considered when determining responsibility. See, also, Instructions to Bidders Section 3.5.3.3.

Secondly, Cleveland takes issue with the fact that Honzo only checked references pertaining to public projects when it checked references for Cleveland,

---

1. As a general rule, injunctive relief should not be granted where the party has an adequate remedy at law. Evidence was presented at trial to demonstrate that Cleveland could ascertain its profits on this project and, therefore, could ascertain its damages. However, at least one court has held that a disappointed bidder is not entitled to damages where, as in the instant action, DAS retained a right to reject all bids and to solicit new bids. See *Kent Business Interiors, Inc. v. Ohio Dept. of Adm. Serv.* (1990), 61 Ohio Misc.2d 847, 585 N.E.2d 603.

but checked references for private projects for Danis. References regarding recent public projects pertain to the prior experience of the bidder as well as his conduct and performance on previous contracts. R.C. 9.312(A), Instructions to Bidders Sections 3.5.3.2 and 3.5.3.4. Honzo testified that he had researched public projects because he was under a time constraint and because he believed that public projects were more similar to the Fisher Project and would give him a better idea of what kind of experience Cleveland had had on a similar project. Moreover, Kaitsa testified that he had independently contacted references for several of the private projects that Cleveland had given as possible recommendations or references. Given the above, we cannot find that this constitutes an abuse of discretion, nor do we find that this constitutes "unannounced" criteria.

■ Cleveland further argues that the committee and DAS improperly considered the fact that the second phase of the Fisher Project would be ongoing during Phase I, that the Fisher Project was of architectural significance, and that it was a legacy project. Initially this court notes that Honzo testified that he would still recommend that Cleveland be found not responsible, even if there were no second phase to the project.

This court finds that such factors go to the ability of Cleveland to execute the contract properly. R.C. 9.312(A). There is testimony in the record regarding the actual site of the construction and what that would mean in terms of students getting to and from OSU, and the constraints of the actual site. All of these were reasonable factors to be considered in determining whether or not Cleveland had the ability to execute the contract properly. See Instructions to Bidders Section 3.5.3.7. Again, it should be noted that these factors were considered for all of the bidders who were being investigated by the committee. Assuming *arguendo* that these criteria were "unannounced," this court cannot find that Cleveland was prejudiced insofar as all of the contractors were subject to the same criteria.

■ Cleveland further objects to the fact that Honzo did not put as much emphasis on written recommendations as he did on telephone conversations. Cleveland points to Morelli's March 19 letter, which indicated that Cleveland's reference checks indicated that they would not have Cleveland on another job, without giving the reasons why Cleveland would not be on some of these jobs. A review of the transcript reveals that Cleveland had the opportunity to explain why RTA would not have Cleveland on another job, namely, that Cleveland did not wish to work on another RTA job. All of this evidence was before the trial court to weigh and consider. It is not this court's function to make those credibility determinations.

Honzo testified as to his reasons for why he did not give much credence or weight to a written recommendation. There was also testimony in the record to

reflect why Honzo preferred to hear from an owner as opposed to a construction manager, and why he would give an owner's opinion more weight. Again, the trial court was free to accept or reject Honzo's testimony. It was free to decide if Honzo's approach was reasonable. Such credibility determinations belong to the trier of fact, not this court.

For all of the above reasons, this court rejects Cleveland's argument that the above constitute "unannounced" criteria. Clearly the information sought by Kaitsa and the committee was collected in an effort to address the factors set forth in R.C. 9.312(A) and in the Instructions to Bidders Sections 3.5.3.1 through 3.5.3.7. Moreover, even if this court were to determine that all of the above constituted "unannounced" criteria, these criteria are not significant enough to destroy the competitive bidding process, given that all of the bidders were subject to the same criteria. As noted by the court in *Wilson Bennett, Inc. v. Greater Cleveland Regional Transit Auth.* (1990), 67 Ohio App.3d 812, 588 N.E.2d 920, not every variation from the instructions or specifications will destroy the competitive character of the bid.

"To have that effect, the variations from the instructions or specifications must be substantial, and to be substantial, it must affect the amount of the bid and must give the bidder an advantage or benefit not allowed to other bidders." *Id.* at 819, 588 N.E.2d at 925.

As previously noted, all of these factors were considered by the committee in reviewing Danis, Dick, and Cleveland. This court cannot find that Danis was given an advantage or benefit not allowed to Cleveland. For those reasons, appellant's second, thirteenth and fourteenth assignments of error are overruled.

Cleveland also argues that the committee and DAS improperly collected this information for purposes of R.C. 9.312 for more than one bidder at one time. Because Sections 3.5.4 and 3.5.5 of the Instructions to Bidders refer only to the lowest responsive *bidder*, singular, Cleveland argues that DAS should have made a responsibility determination as to the lowest responsive bidder first, before collecting any further information as to any other bidder's responsibility.

This court is cognizant of R.C. 153.08, which states:

"*After investigation, which shall be completed within thirty days,* the contract shall be awarded by such owner to the lowest responsive and responsible bidder in accordance with section 9.312 of the Revised Code." (Emphasis added.)

Given the time constraints of R.C. 153.08, this court cannot find that DAS abused its discretion in collecting this information from the first, second and third lowest bidders. Moreover, the record does not support Cleveland's contention that it was compared to other bidders. Rather, the record supports the

appellees' assertion that the bidders were investigated independently of each other and that the contractors were likewise evaluated independently and not on a comparative basis. Again, the trial court was in a better position to determine the credibility of witnesses and to weigh their testimony on this issue. Accordingly, this court cannot find that the trial court abused its discretion in rejecting Cleveland's position, which would prohibit a simultaneous investigation of more than one bidder. Accordingly, the appellant's thirteenth and fourteenth assignments of error are overruled for that reason as well.

In Cleveland's sixth assignment of error, Cleveland argues that the court erred when it utilized the wrong standard for abuse of discretion in the context of public competitive bidding, in making its determination that Cleveland was not entitled to the relief requested. The Supreme Court's decision in *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.* (1995), 73 Ohio St.3d 590, 653 N.E.2d 646, is dispositive of this issue. In that case the Ohio Supreme Court held that, to establish bad faith and/or an abuse of discretion, the construction company, Danis, was required to prove that the district acted in bad faith or with an unreasonable, arbitrary or unconscionable attitude. In *Danis*, the evidence demonstrated that members of the district's board may have been influenced by citizens opposed to the selection of Danis's proposal. The court noted as follows:

"It is true that Danis presented evidence that one District board member had indicated he would 'help lead the fight against Danis,' and that prior to the date set for submission of proposals another board member had written a handwritten note indicating that the District 'must follow the procedures & preserve [the District's] ability to oppose Danis in the future.' * * * *It is clear that the members of the District's board may have been* influenced by citizens opposed to the selection of Danis's proposal, *and may well have held a predisposition against accepting its proposal. However, such a reluctance under the circumstances of this case does not necessarily demonstrate bad faith or abuse of discretion.*" (Emphasis added.) *Id.* at 604–605, 653 N.E.2d at 658.

The Supreme Court found that this did not necessarily demonstrate bad faith or an abuse of discretion.

Likewise, even though Jill Morelli had heard negative comments from Ron Kull, the architect at the University of Cincinnati, regarding the DAAP project, or had a "predisposition" against Cleveland, such factors would not necessarily rise to the level of bad faith and/or an abuse of discretion.

Cleveland cites the Supreme Court's decision in *Dayton ex rel. Scandrick v. McGee* (1981), 67 Ohio St.2d 356, 21 O.O.3d 225, 423 N.E.2d 1095, wherein the court noted that abuse of discretion connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude. *Id.*

at 359, 21 O.O.3d at 226–227, 423 N.E.2d at 1097. The Supreme Court further defined arbitrary as being " 'without adequate determining principle; * * * not governed by any fixed rules or standard.' " It further stated that unreasonable means irrational. *Id.* at 359, 21 O.O.3d at 226, 423 N.E.2d at 1097.

Cleveland argues that the above definition of "abuse of discretion" should have been utilized by the trial court. This court notes that in both the *Danis* and the *Scandrick* cases, the court defined "abuse of discretion" as an unreasonable, arbitrary or unconscionable attitude. *Danis, Scandrick, supra;* see, also, *Cedar Bay Construction, supra,* 50 Ohio St.3d at 21–22, 552 N.E.2d at 204–205.

Moreover, in the *Wilson Bennett* case, the court cited *Scandrick* for the proposition that one was not required to award the contract to the lowest bidder; but was rather empowered to make a qualitative determination as to which bid was both lowest and best. In this case, DAS had the discretion to determine which bid was the lowest, responsive, and responsible bid. R.C. 9.312. We cannot find that DAS abused its discretion, nor can we find that the trial court's judgment to that effect is unreasonable or arbitrary or demonstrates an unconscionable attitude. For all of the above reasons, appellant's sixth assignment of error is overruled.

 In its ninth assignment of error, Cleveland objects to the trial court's finding that the committee that undertook the responsibility investigation was doing so for and on behalf of DAS. Testimony at trial revealed that two of the committee members, Honzo and Carpenter, worked for companies that had contracts with DAS for the Fisher Project. DAS contracted with Karlsberger to act as its associate architect on the Fisher Project. Carpenter is Karlsberger's project manager on the Fisher Project. DAS also contracted with the Gilbane Building Company to act as the construction manager, and Honzo was serving as Gilbane's project manager for the Fisher Project. Both Kaitsa and Drabik testified that they understood that the committee performing the investigation contained two DAS representatives, namely Honzo and Carpenter.

Moreover, Kaitsa was free to accept and/or reject the recommendations of the committee. Both Morelli and Hamilton testified that they understood that DAS would review the investigation and recommendation made by the committee, and that DAS had the ultimate authority in determining responsibility. The record reflects that the ultimate determination was left to Kaitsa and the director of DAS, Sandra Drabik. In fact, after the protest meeting, Kaitsa did recommend that a finding of the committee be changed and that Cleveland be found to be financially responsible.

Cleveland apparently takes the position that Kaitsa must conduct every responsibility determination personally. This court cannot find that the statute

prohibits Kaitsa from delegating this duty. It should be noted that Cleveland correctly points out that there is testimony in the record to reflect that Kaitsa and/or the director of DAS did not delegate this authority up front. However, the fact remains that after the investigation was complete, and once DAS discovered that this investigation had been completed, DAS was free to use that information in order to determine whether Cleveland should be deemed not responsible for this particular project. For those reasons, this court finds that the trial court did not err in finding that the committee undertook its responsibility investigation on behalf of DAS, insofar as DAS utilized that investigation in making its final determination. Appellant's ninth assignment of error is overruled.

In its fifteenth assignment of error, Cleveland argues that the trial court erred in finding that DAS and OSU had unbridled discretion to accept another bid or reject all bids when either party determined it would not be in the best interest of the state to award to the lowest responsive bidder. Initially it should be noted that the statute in question discusses the lowest responsive *and responsible* bidder. R.C. 9.312 and 153.09.

R.C. 153.09 provides:

"If in the opinion of the owner referred to in section 153.01 of the Revised Code, the award of a contract to the lowest responsive and responsible bidder is not in the best interests of the state, with the written consent of the department of administrative services, it may accept another proposal so opened or reject all proposals, and advertise for other bids."

Section 3.4.4 of the Instructions to Bidders provides:

"If, in the opinion of the Owner, the award of the contract to the lowest Bidder is not in the best interest of the State, with the written consent of the Director, the Owner may accept, in its discretion, another bid so opened or reject all bids, and advertise for other bids, pursuant to Section 153.09, ORC."

This court notes that Section 3.4.4 only discusses the lowest bidder, whereas R.C. 153.09 refers to the lowest responsive and responsible bidder. However, it is also apparent that Section 3.4.4 in the Instructions to Bidders states that action may be taken pursuant to R.C. 153.09. Thus, given that this Instruction to Bidders specifically refers to the statute which contains the "lowest responsive and responsible bidder" language, R.C. 153.09 and Section 3.4.4 of the Instructions to Bidders are not necessarily in conflict and, in fact, may be reconciled.

In this assignment of error, Cleveland objects to conclusion of law No. 25, wherein the trial court stated that DAS had no legal duty to award the contract for the general trades portion of the project to Cleveland in that DAS and OSU always had the right to accept another bid or to reject all bids when not

in the best interest of the state, pursuant to Section 3.4.4 of the Instructions to Bidders and R.C. 153.09. A review of the Instructions to Bidders and of the Revised Code makes it clear that the owner, with the written consent of DAS, does have the ability to accept another proposal or reject all proposals if it determines that the award of the contract to the lowest responsive and responsible bidder is not in the best interest of the state.

Cleveland has not presented any argument to this court to explain why the trial court should not have abided by R.C. 153.09. Nor does Cleveland argue that R.C. 153.09 is in any way unconstitutional. This court cannot find that the trial court abused its discretion in finding that DAS and OSU (with the permission of DAS) had discretion to refuse to award a contract to the lowest bidder if it was not in the best interest of the state.

▮▮▮ Moreover, the record supports DAS's finding that awarding the contract to a nonresponsible bidder was not in the best interest of the state. The record is replete with testimony regarding dissatisfaction on the part of owners with Cleveland's performance in the past. John Childress, who is the owner's representative on the DAAP project, testified at length regarding the difficulties that had been encountered in working with Cleveland on the DAAP project at the University of Cincinnati. On appeal, Cleveland adamantly challenges and attempts to undermine Childress's testimony, but the issues of Childress's credibility and what weight ought to be given his testimony belong to the trier of fact, not to this court. For all of the above reasons, appellant's fifteenth assignment of error is overruled.

▮▮▮ In its sixteenth assignment of error, Cleveland argues that the trial court erred in finding that the contract entered into between DAS and Danis is not void *ab initio*. It is Cleveland's contention that R.C. 9.312 is mandatory, and that where a statute is mandatory, any contract entered into in violation of that statute is void.

The trial court found that the contract entered into between DAS and Danis complied with R.C. 9.312 and was therefore a legitimate contract. This court agrees. A review of the transcript demonstrates that the provisions of R.C. 9.312 were complied with. Cleveland's argument to the contrary, regarding "unannounced" criteria, is not well taken. Again, as in prior assignments of error, Cleveland argues that DAS utilized unannounced and unlawful criteria to determine responsibility. This court has previously rejected that argument in our discussion of Cleveland's second, thirteenth and fourteenth assignments of error. Appellant's sixteenth assignment of error is likewise overruled.

▮▮▮ Next, Cleveland argues that several sections of the front-end documents, specifically the Instructions to Bidders, are invalid and unlawful insofar as

they were not promulgated in accordance with R.C. Chapters 119 and 123. Specifically, Cleveland sets forth its first, third, fourth, seventh, eighth, and twelfth assignments of error as pertaining to this issue. Cleveland argues that the trial court erred when it denied Cleveland's request for declaratory relief and/or injunctive relief on the grounds that DAS has failed to legally promulgate rules and/or regulations to govern its responsibility determinations. Cleveland further argues that DAS utilized illegal rules because the rules were not legally promulgated and, thus, the trial court erred when it held that R.C. 9.312 is not subject to R.C. Chapter 119. Likewise, Cleveland argues that the trial court erred in finding that the Instructions to Bidders were also not subject to the rule-making process set forth in R.C. Chapter 119. R.C. 119.01(A) provides:

" 'Agency' means, except as limited by this division, any official, board, or commission having authority to promulgate rules or make adjudications in the bureau of employment services, the civil service commission, the department of industrial relations, the department of liquor control, the department of taxation, the industrial commission, the bureau of workers' compensation, the functions of any administrative or executive officer, department, division, bureau, board, or commission of the government of the state specifically made subject to sections 119.01 to 119.13 of the Revised Code, and the licensing functions of any administrative or executive officer, department, division, bureau, board, or commission of the government of the state having the authority or responsibility of issuing, suspending, revoking, or canceling licenses."

As noted by this court in *Stanfield v. Ohio Dept. of Admin. Servs.* (June 27, 1985), Franklin App. No. 84AP–1050, unreported, 1985 WL 10356, R.C. 119.01(A) designates three categories of agencies for purposes of the application of R.C. Chapter 119. In *Stanfield,* this court noted that the second category applied to those administrative departments or divisions that were specifically made subject to R.C. 119.01 to 119.13. The third category pertained to administrative agencies with authority to issue, suspend, revoke, or cancel licenses. This court found that the second and third categories set forth in R.C. 119.01(A) simply did not apply to DAS.

Thus, the issue was whether or not the first category, which consisted of agencies enumerated in the statute, applied to DAS. In *Stanfield,* the issue was whether DAS constituted a civil service commission for purposes of R.C. 119.01(A). This court ultimately held that R.C. 119.01(A) referred to DAS where it used the term "civil service commission" with regard to the final orders DAS issued upon an appeal pursuant to R.C. 124.385. R.C. 124.385 simply does not apply in the instant action. Moreover, unlike R.C. 124.385, R.C. 9.312 does not provide for an "appeal" to an administrative agency. In fact, the protest meeting set forth therein is specifically exempted from an appeal pursuant to R.C. 119.12.

R.C. 9.312(B) provides:

"Notwithstanding any other provisions of the Revised Code, the procedure described in this *division* is not subject to Chapter 119. of the Revised Code." (Emphasis added.)

Cleveland argues that this language pertains only to the protest meeting that is described and set forth in R.C. 9.312(B). A review of the statute demonstrates that the word "division" appears to apply to division A, B and C, whereas the word "section" appears to apply to the entire code section: R.C. 9.312. Thus, this court is inclined to agree with Cleveland that the above language only pertains to R.C. 9.312(B).

However, the fact that the legislature chose to specifically state that such a protest meeting would not be subject to R.C. Chapter 119 also lends credence to the appellees' argument. Clearly, if the legislature had wanted the state agency, a political subdivision that is required by law to award contracts to the lowest responsive and responsible bidder, to promulgate rules in accordance with R.C. Chapter 119, it could have done so. The legislature clearly specifies R.C. Chapter 119 in R.C. 9.312(B). Had it wanted divisions A and C to be subject to R.C. Chapter 119, it could have articulated that intent. As pointed out by appellees, R.C. 125.101 states:

"(A) The director of administrative services shall establish *policy and procedure guidelines* for contract documents in conjunction with the administration of public works contracts that the state or any institution supported in whole or in part by the state enters into for any project subject to sections 153.01 to 153.11 of the Revised Code." (Emphasis added.)

The fact that the legislature chose the words "policy and procedure guidelines" rather than "rule" and failed to otherwise specify that rules shall be promulgated pursuant to R.C. Chapter 119, further supports appellees' argument that R.C. Chapter 119 does not apply to R.C. 9.312.

Cleveland cites several cases wherein agencies themselves have designated items as "policies," "position papers" or "guidelines" when, in fact, such items were subject to R.C. Chapter 119 and its rule-making provisions. In many of those cases, courts noted that the mere labeling of a rule as a "policy" or "guideline" was insufficient to avoid the fact that the items contained therein should have been promulgated as rules pursuant to R.C. 119. See *State ex rel. Eaton Corp. v. Lancaster* (1988), 40 Ohio St.3d 404, 534 N.E.2d 46; *Ohio Nurses Assn., Inc. v. State Bd. of Nursing Edn. & Nurse Registration* (1989), 44 Ohio St.3d 73, 540 N.E.2d 1354.

These cases are easily distinguishable from the instant action. In the case before us, this court is not reviewing a "policy" or a "guideline" labeled as such

by a state agency. Rather, this court is reviewing the statutory language *chosen by the legislature.* This court can only presume that the legislature chose to use the statutory language set forth in R.C. 125.101 for a reason.

For all the above reasons, this court cannot find that the trial court erred or abused its discretion in determining that Cleveland was not entitled to declaratory relief and/or that DAS had utilized illegal rules and had failed to legally promulgate rules and/or regulations to govern the determination of responsibility. Thus, we affirm the trial court's finding that R.C. 9.312 and DAS's Instructions to Bidders are not subject to the provisions of R.C. Chapter 119. For all of the above reasons, appellant's first, third, fourth, seventh, eighth and twelfth assignments of error are hereby overruled.

Cleveland also argues that R.C. 9.312 is unconstitutionally vague and sets forth three assignments of error pertaining to this argument. First, Cleveland argues that the trial court erred when it denied Cleveland's request for injunctive relief and/declaratory relief on the grounds that R.C. 9.312 is unconstitutionally vague. Next, Cleveland argues that the protest meeting contemplated by R.C. 9.312 violated Cleveland's rights under Ohio law, the Ohio Constitution, and/or the United States Constitution. Finally, Cleveland argues that the trial court erred in finding that the criteria set forth in R.C. 9.312 are announced, clear and reasonable. We will first address Cleveland's fifth and eleventh assignments of error.

Initially this court notes that all legislative enactments enjoy a strong presumption of constitutionality. See *State v. Collier* (1991), 62 Ohio St.3d 267, 581 N.E.2d 552. The factors for determining responsibility set forth in R.C. 9.312 are not unconstitutionally vague. This court agrees with the trial court's finding that a person of ordinary intelligence can understand the criteria being evaluated in determining responsibility, namely, the bidder's experience, financial condition, conduct and performance of previous contracts, facilities, management skills, and ability to execute the contract properly. R.C. 9.312(A).

As previously noted, Cleveland never requested any further information from DAS once it received Kaitsa's March 5, 1996 letter. Had Cleveland found that the criteria listed therein were vague, or difficult to understand, one would expect Cleveland to have contacted DAS to specifically ask what it was that DAS was looking for. To the contrary, the transcript demonstrates that John Zeller, Cleveland's vice-president, who was responsible for submitting information to DAS in response to Kaitsa's March 5, 1996 letter, testified that he understood what type of information was being considered in determining responsibility. Nor was there any other evidence presented that any other bidder had difficulty understanding the criteria that were being utilized to determine responsibility.

Given the above testimony, and given the fact that Cleveland had the burden of proving, by clear and convincing evidence, that it was entitled to injunctive and/or declaratory relief because R.C. 9.312 was unconstitutionally vague, this court finds that Cleveland simply failed to meet its burden of proof. *W.C.I./Waltek, supra.* This court cannot find that R.C. 9.312 is unconstitutionally vague. Nor can we find that the trial court erred in its finding that the criteria set forth in R.C. 9.312 are announced, clear and reasonable. Accordingly, Cleveland's fifth and eleventh assignments of error are hereby overruled.

In its tenth assignment of error, Cleveland argues that the trial court erred in finding that the protest meeting contemplated by R.C. 9.312 and conducted in this case did not violate Cleveland's rights under Ohio law, the Ohio Constitution, and/or the United States Constitution. Essentially, Cleveland takes issue with the fact that the committee members were not present and that Cleveland was not given the opportunity to cross-examine the committee members about their investigation and their subsequent findings.

Initially this court notes that R.C. 9.312(B) refers to a protest *meeting;* it does not refer to a protest *hearing.* Secondly, this court notes that the Fourteenth Amendment to the United States Constitution prohibits any state from depriving an individual of life, liberty or property without due process of law. However, one is not automatically entitled to the procedural protection of the Due Process Clause unless and until one has an interest which is encompassed by the Fourteenth Amendment. *Bd. of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548, 556. The same is true under our analysis of Ohio law and the Ohio Constitution. See *Lee v. Cuyahoga Cty. Court of Common Pleas* (1991), 76 Ohio App.3d 620, 602 N.E.2d 761.

To have a property interest in a benefit, such as a public works contract, a person clearly must have more than an abstract need or desire for it. One must have more than a unilateral expectation; rather, one must instead have a legitimate claim of entitlement to such a contract. See *Dixon v. Brown* (May 16, 1996), Cuyahoga App. No. 66931, unreported, 1996 WL 257443; *Depas v. Highland Local School Dist. Bd. of Edn.* (1977), 52 Ohio St.2d 193, 6 O.O.3d 421, 370 N.E.2d 744.

Clearly, contracts with state entities may give rise to a property right which is protected under the Fourteenth Amendment. However, not every contract gives rise to a protected property interest. As noted by the Sixth Circuit Court of Appeals, in *United of Omaha Life Ins. Co. v. Solomon* (C.A.6, 1992), 960 F.2d 31, 34, a disappointed bidder to a government contract may establish a legitimate claim of entitlement protected by due process by showing

either that it was actually awarded the contract at any procedural stage or that local rules limited the discretion of state officials as to whom the contract should be awarded.

If a charging party fails to demonstrate either of these, there is no property right to which due process rights attach. This court has previously stated that the trial court did not abuse its discretion in finding that Cleveland was not the lowest responsive and responsible bidder. A party that is a second- or third-place finisher in a determination of lowest and best bidder does not acquire a constitutionally protected property right. See *Miami Valley Contrs., Inc. v. Oak Hill* (1996), 108 Ohio App.3d 745, 752, 671 N.E.2d 646, 650.

Moreover, given the fact that OSU and/or DAS retained the right to reject all bids, this court is further persuaded that Cleveland did not have a property interest in the contract for the Fisher Project. Thus, even if the "protest meeting" language set forth in R.C. 9.312 were construed to mean "hearing," any procedural due process rights that Cleveland would be entitled to would flow from the statute, not the Fourteenth Amendment. For without a property interest, Fourteenth Amendment procedural due process concerns are not implicated. Given that the statute only provides for a "meeting," and given that Cleveland had the opportunity to attend such a meeting to present its case, this court cannot find that the trial court erred in finding that Cleveland's rights were not violated. Accordingly, appellant's tenth assignment of error is overruled.

Finally, Cleveland argues that the trial court erred in allowing intervenors-appellees OSU and Danis to intervene. Cleveland essentially argues that OSU and Danis did not have an interest in this action that was not already represented by DAS or that required representation by intervention of the parties. Cleveland argues that OSU and DAS are one and the same entity, and that OSU has no interest that is not already protected by DAS. This argument is rather interesting given the fact that Cleveland strongly objected to OSU's investigation of bidders on behalf of DAS. In any event, as the owner of the construction project and the entity that would use this project, OSU has an interest in this case. Courts consistently apply an abuse-of-discretion standard when reviewing trial courts' rulings on motions to intervene, pursuant to Civ.R. 24. See *Kourounis v. Raleigh* (1993), 89 Ohio App.3d 315, 624 N.E.2d 276; *In re Ring* (June 28, 1994), Franklin App. No. 93APF12–1693, unreported, 1994 WL 312904. This court is not persuaded that the trial court erred or abused its discretion by permitting OSU to intervene in this action.

As to Danis, Cleveland argues that the issue in this case is whether DAS's conduct, with respect to Cleveland, was arbitrary, capricious, and unreasonable so as to constitute an abuse of discretion. Therefore, Cleveland argues

that Danis has no issue before the court to be resolved. Cleveland argues that Danis has no standing to intervene because, in order for a party to have standing, there must be a justiciable controversy and the party seeking standing must have a sufficient stake in the outcome.

This court finds that Danis has a sufficient stake in the outcome of this case. Cleveland seeks the following relief: to be declared the lowest responsive and responsible bidder, and to be declared the recipient of this contract; and to have an injunction issued that would prohibit further execution of the general trades portion of the Fisher Project, which is currently being executed by Danis. Were this court to grant Cleveland the relief it seeks, Danis would obviously be affected. Given that Danis clearly has a stake in the outcome of this case, this court cannot find that the trial court erred or abused its discretion in permitting Danis to intervene in this action.

Moreover, this court cannot find that Cleveland has asserted any prejudice because OSU and Danis were added as parties to this action. Thus, any error that may have taken place by the addition of these parties would not be sufficient to constitute reversal in this case. Accordingly, appellant's seventeenth assignment of error is overruled.

For all of the above reasons, appellant's assignments of error are hereby overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

TYACK, P.J., and CLOSE, J., concur.