STEINGASS MECHANICAL CONTRACTING, INC., Appellant,

v.

WARRENSVILLE HEIGHTS BOARD OF EDUCATION, Appellee.

[Cite as *Steingass Mechanical Contracting, Inc. v. Warrensville Hts. Bd. of Edn.*, 151 Ohio App.3d 321, 2003-Ohio-28.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 80921.

Decided Jan. 9, 2003.

322

Ross, Brittain & Schonberg, David T. Andrews and Alan D. Ross, for appellant.

Trivers & Dickerson and Oscar Trivers, for appellee.

---

ANNE L. KILBANE, Judge.

{¶ 1} This is an appeal from an order of Judge Richard McMonagle denying the motions of appellant Steingass Mechanical Contracting, Inc. ("Steingass") to enjoin the Warrensville Heights Board of Education ("the board") from awarding contracts for plumbing and fire-protection work or to find the board in violation of Ohio's "sunshine law."[1] We affirm.

{¶ 2} From the record we glean the following: In June 2001, the board publicly announced that it was soliciting bids for a series of renovations to Warrensville Heights High School and, in response, Steingass submitted the lowest bids for two contracts, dealing with, respectively, plumbing and fire-protection improvements.

{¶ 3} A "fact book" compiled by a "plumbers' union" was made available to each board member. It detailed the performance history of Steingass, and noted problems the company had in terms of working with other contractors, maintaining a safe work environment, following prevailing wage laws, and completing work in a timely and competent manner. At a board meeting on August 28, 2001, member Clarence Love discussed the fact-book allegations and, based on its contents, recommended not accepting Steingass's bids. Then the board voted to award the plumbing contract to E.B. Katz ("Katz") and the fire-protection contract to S.A. Communale Company ("Communale"), each the next lowest bidders. Steingass had not sent a representative to this board meeting and, therefore, did not dispute Love's statements or the award of the contracts.

{¶ 4} Through a letter from its lawyer, Deane Buchanan, the board notified Steingass that, although it was the lowest bidder on two contracts, it was not a "responsible" bidder because, through its investigation, past performance problems had been brought to the board's attention. The board allowed Steingass to appear at a meeting on September 25, 2001, to address the concerns that

---

1. R.C. 121.22 is identified in Anderson's Revised Code as "Meetings of public bodies to be public; exceptions."

prompted the rejection of its bids, but the board was unconvinced and confirmed its contract awards to Katz and Communale.

{¶ 5} Steingass sued to enjoin the board from awarding the contracts to its competitors. It sought a remand that would require the board to declare it to be the lowest responsible bidder and award it the contracts. It alleged that the board did not apply the correct legal standard in deciding to whom to award the contracts and had failed to adequately investigate whether Katz or Communale were responsible companies.

{¶ 6} Because the minutes revealed that the board had met in private "Executive Sessions," once on August 28, before its vote, and twice on September 25—before and after Steingass's presentation and before it voted to confirm its earlier contract awards, Steingass later asserted a "sunshine law" violation. It claimed that the board in executive session improperly decided to award the contracts to Katz and Communale or had otherwise improperly convened in executive session, thereby rendering the contracts void as a matter of law, and sought a remand, damages, and attorney fees under R.C. 121.22(H) and (I).

{¶ 7} After a two-day trial, the judge denied, from the bench, the injunctive relief, Steingass moved for findings of fact and conclusions of law, and the following day the judge issued his order denying the injunction for violations of the public bidding and open meetings laws. Thereafter, Steingass filed its notice of appeal, and we stayed the case, remanding to allow the judge to issue findings of fact and conclusions of law, which he did.

{¶ 8} In its first of three assignments of error, Steingass asserts that it was an abuse of discretion to uphold the board's decision to reject its bids, where the evidence established that the awards were not based upon the "lowest responsible" bid but, instead, upon the "most qualified" standard. Under R.C. 3313.46:

{¶ 9} "(A) In addition to any other law governing the bidding for contracts by the board of education of any school district, when any such board determines to build, repair, enlarge, improve, or demolish any school building, the cost of which will exceed twenty-five thousand dollars, except in cases of urgent necessity, or for the security and protection of school property, and except as otherwise provided in division (D) of section 713.23 and in section 125.04 of the Revised Code, all of the following shall apply:

{¶ 10} "* * *

{¶ 11} "(6) None but the lowest responsible bid shall be accepted."

{¶ 12} And under R.C. 9.312(A):

{¶ 13} "If a state agency or political subdivision is required by law or by an ordinance or resolution adopted under division (C) of this section to award a

contract to the lowest responsive and responsible bidder, a bidder on the contract shall be considered responsive if the bidder's proposal responds to bid specifications in all material respects and contains no irregularities or deviations from the specifications which would affect the amount of the bid or otherwise give the bidder a competitive advantage. The factors that the state agency or political subdivision shall consider in determining whether a bidder on the contract is responsible include the experience of the bidder, the bidder's financial condition, conduct and performance on previous contracts, facilities, management skills, and ability to execute the contract properly."

{¶ 14} "The term 'responsible' is not, however, limited to pecuniary ability * * * but pertains to many other characteristics of the bidder, such as his general ability and capacity to carry on the work, his equipment and facilities, his promptness, and the quality of work previously done by him, his suitability to the particular task, and such other qualities as are found necessary to consider in order to determine whether or not, if awarded the contract, he could perform it strictly in accordance with its terms."[2]

{¶ 15} Since a determination of responsibility will necessarily differ for any given project, it is important that it be subject to a fluid, abuse-of-discretion standard.[3] Accordingly, while the criteria used will frequently be the same as or similar to that espoused in *Hudson,* as long as the board does not act arbitrarily, capriciously, or unreasonably, it will not have abused its discretion.[4]

{¶ 16} "It is well established that courts should take "particular caution in granting injunctions, especially in cases affecting a public interest where the court is asked to interfere with or suspend the operation of important works or control the action of another department of government."[5] * * * '[T]o prevail on a complaint seeking injunctive relief with respect to the award of a public contract, [the contractor] must prove by clear and convincing evidence that the award constituted an abuse of discretion and resulted in some tangible harm

---

2. *Hudson v. Wheelersburg Rural School Dist. Bd. of Edn.* (1931), 41 Ohio App. 402, 407, 11 Ohio Law Abs. 274, 179 N.E. 701.

3. *State ex rel. George Allen Constr. Co. v. Cleveland Bd. of Edn.* (June 5, 1986), Cuyahoga App. No. 50581, 1986 WL 6358.

4. Cf. *Dayton ex rel. Scandrick v. McGee* (1981), 67 Ohio St.2d 356, 21 O.O.3d 225, 423 N.E.2d 1095.

5. *Cleveland Constr., Inc. v. Ohio Dept. of Adm. Serv., Gen. Serv. Adm.* (1997), 121 Ohio App.3d 372, 383, 700 N.E.2d 54, quoting *Leaseway Distrib. Centers v. Ohio Dept. of Adm. Serv.* (1988), 49 Ohio App.3d 99, 106, 550 N.E. 2d 955.

to the public in general, or to [the contractor] individually.' "[6] (Footnote added.) "Clear and convincing evidence" is that measure or degree of proof that will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.[7]

{¶ 17} Steingass alleges that it had clearly and convincingly demonstrated an abuse of discretion by the board's failure to award it the contracts. It supports its argument with three main evidentiary points: that the minutes of the August 28, 2001 meeting refer to the board's consideration of "which bidders are most qualified," that board member Mattie L. Smith testified at hearing that the board was seeking the "best bidder," and that it elicited testimony from board member Sandra Noble that the board was seeking the most qualified bidder. Therefore, it argues that the board used a much higher degree of discretion in selecting suitable contractors than is invested in the "lowest responsible" standard contained in both R.C. 3313.46 and 9.312. We disagree.

{¶ 18} Buchanan testified that, during the executive sessions, he advised the board about its rights and responsibilities in selecting a bidder. Noble testified that, to her, the "most qualified" bidder was defined as the "responsive low bidder and responsible [sic]," and Love also testified that he evaluated Steingass, as well as Katz and Communale, from the perspective of their respective responsibility. This testimony establishes that these board members used the correct standard in rejecting Steingass's bids. Smith testified that she used "the standard," as phrased by Steingass's attorney, of "best bidder" in casting her vote to approve the award of the bids to Katz and Communale, which is a statement that begs the question "Best bidder under what *legal* standard?" Smith's statement is not helpful in supporting or detracting from the board's decision. Consistent with Noble's and Love's testimony, it is undisputed that Buchanan's letter to Steingass indicated that its bids were being rejected because the board had determined that it was *not* a responsible bidder.

{¶ 19} Language irregularities in the meeting minutes or Steingass's semantical jousting with witnesses notwithstanding, it did not provide direct evidence that indicated that the board used an incorrect legal standard in evaluating the acceptability of its bid, much less that it had it done so with convincing clarity. This assignment of error is overruled.

---

6. *Monarch Constr. Co. v. Ohio School Facilities Comm.*, 150 Ohio App.3d 134, 2002-Ohio-6281, 779 N.E.2d 844, at ¶ 35, quoting *Cleveland Constr., Inc.*, supra, fn. 5, 121 Ohio App.3d at 384, 700 N.E.2d 54.

7. *State v. Eppinger* (2001), 91 Ohio St.3d 158, 164, 743 N.E.2d 881.

{¶ 20} Steingass next contends that because the board reviewed allegations about its work but failed to review or investigate the other bidders' qualifications or responsibility, it was an abuse of discretion to uphold the decision not to award it the contracts.

{¶ 21} "The legislative intent which prompted the passage of R.C. 3313.46 was obviously to provide for open and honest competition in bidding for public contracts and to save the public harmless, as well as bidders themselves, from any kind of favoritism or fraud in its varied forms."[8] Steingass alleges that the board abused its discretion when, based upon a purported "fact book," it unfairly subjected the company to harsh investigation to determine its responsibility to complete any contract under R.C. 9.312 and 3313.46, while no other bidder was so examined. We disagree.

{¶ 22} Randy Reber, project coordinator for Turner Construction, Inc., was responsible for preparation of the relevant contract bids. Upon submission, he was to ensure that they were responsive, in terms of form. His other duties included recommending which contractors should or could be selected by the board and overseeing everything about the daily progress and successful completion of the high school renovation and other school improvement projects occurring in the Warrensville Heights School District. He testified that, upon opening sealed bids for a given project, he would rank the bids in order of amount, and contact and interview at least the two lowest bidders to ensure that the bids they submitted actually accounted for all of the work specified at the proposed cost, and would note any problems he uncovered for the board's consideration. He stated that he initially recommended Steingass for the plumbing and fire-protection contracts and only later became aware of the "fact book" when told by Steingass that it was "propaganda." He had been aware that copies of the book had been provided to at least some members of the board and assumed that they would investigate its claims if they wished.

{¶ 23} Love testified that in order to investigate allegations that Steingass had installed a defective fire protection system in a Solon school building, he contacted the Solon City School District and was told by the person he contacted that it was true. He also explained that he received a letter from a company identified as "Laser," which strongly advised him not to use Steingass as a contractor on the project. Finally, he noted that Steingass had been denied the award of a contact bid submitted to Lorain County because of past problems encountered in connection with contracts it had previously awarded Steingass.

---

8. *Chillicothe City School Dist. Bd. of Edn. v. Sever–Williams Co.* (1970), 22 Ohio St.2d 107, 115, 51 O.O.2d 173, 258 N.E.2d 605.

{¶ 24} According to the minutes of the August 28, 2001 board meeting, Love "shared his concerns with Steingas [sic]." While Steingass makes much of the admitted lack of personal investigation undertaken by any other board member into its prior allegedly unsatisfactory work, the board, with the exception of Rookard, were present at the public meeting to hear Love share his concerns. Additionally, all board members attended the September 25, 2001 meeting at which Steingass, in light of the allegations in the "fact book," attempted to rehabilitate its responsibility.

{¶ 25} Love was aware that Katz had satisfactorily performed earlier contract work for the board and that the "fact book" noted that Communale had been given preference over Steingass on a different project. As a result he, and the rest of the board, assumed that, in the absence of "red flags" brought to their attention by either Reber or outside parties, each contractor was responsible.

{¶ 26} Under the totality of the circumstances, we cannot say that the board gave any other contractor an advantage by checking into Steingass's potential irresponsibility, especially in view of the criteria involved in determining it under R.C. 9.312, including a prospective contractor's conduct and performance on previous contracts, management skills, and ability to execute the contract properly.[9]

{¶ 27} Steingass did not present any evidence to challenge the finding that it was not a responsible bidder and only argued, both below and here, that the board went to greater investigative depth in evaluating it than any competitor. One could question, therefore, what Steingass hopes to achieve through these proceedings because the matter would seem to be remanded solely for a determination of why any hypothetical next-highest bidder would be awarded the contract, or whether any bid would be accepted at all. The board's decision that Steingass was not a responsible bidder statutorily removes it from consideration for the contracts at issue, whether it is the lowest or highest bidder and any other contractor is or is not found to be responsible.[10]

{¶ 28} "[T]o prevail on a complaint seeking injunctive relief with respect to the award of a public contract, [a plaintiff] must prove by clear and convincing evidence that the award constituted an abuse of discretion and resulted in some tangible harm to the public in general, or to [the plaintiff] individually."[11] We overrule this assignment of error.

---

9. R.C. 9.312(A).

10. R.C. 3313.46(A)(6).

11. *Cleveland Constr., Inc. v. Ohio Dept. of Adm. Serv.* (1997), 121 Ohio App.3d 372, 384, 700 N.E.2d 54.

{¶ 29} Finally, Steingass submits that it was an abuse of discretion to find that the board did not violate Ohio's open meetings laws when it went into executive sessions for purposes not permitted thereunder.

{¶ 30} R.C. 121.22(I) provides that the person asserting a violation of Ohio's Sunshine Law bears the burden of proving that the violation occurred. Since an action thereunder is civil in nature, absent any common-law or statutory authority stating otherwise, a claimant bears the burden of proving a violation by a preponderance of the evidence.[12] A preponderance of the evidence means the greater weight of the evidence.[13] If the evidence before the court is left in equipoise, i.e., furnishes an equal basis for a choice among different possibilities, then the one asserting has failed to sustain his or her burden of proof by a preponderance of the evidence.[14]

{¶ 31} R.C. 121.22 provides:

{¶ 32} "(A) This section shall be liberally construed to require public officials to take official action and to conduct all deliberations upon official business only in open meetings unless the subject matter is specifically excepted by law.

{¶ 33} "(B) As used in this section:

{¶ 34} "(1) 'Public body' means any of the following:

{¶ 35} "(a) Any board, commission, committee, council, or similar decision-making body of a state agency, institution, or authority, and any legislative authority or board, commission, committee, council, agency, authority, or similar decision-making body of any county, township, municipal corporation, school district, or other political subdivision or local public institution;

{¶ 36} "* * *

{¶ 37} "(2) 'Meeting' means any prearranged discussion of the public business of the public body by a majority of its members.

{¶ 38} "* * *

{¶ 39} "(G) Except as provided in division (J) of this section, the members of a public body may hold an executive session only after a majority of a quorum of the public body determines, by a roll call vote, to hold an executive session and

---

12. *State ex rel. Randles v. Hill* (Mar. 20, 1992), Lucas App. No. L90–169, 1992 WL 55430, citing *Cincinnati, Hamilton & Dayton Ry. Co. v. Frye* (1909), 80 Ohio St. 289, 88 N.E. 642; 44 Ohio Jurisprudence 3d (1983) 433, Evidence and Witness, Section 1027.

13. *Travelers' Ins. Co. of Hartford Connecticut v. Gath* (1928), 118 Ohio St. 257, 160 N.E. 710.

14. *Kata v. Second Natl. Bank of Warren* (1971), 26 Ohio St.2d 210, 55 O.O.2d 458, 271 N.E.2d 292.

only at a regular or special meeting for the sole purpose of the consideration of any of the following matters:

{¶ 40} "* * *

{¶ 41} "(3) Conferences with an attorney for the public body concerning disputes involving the public body that are the subject of pending or imminent court action; * * *

{¶ 42} "(5) Matters required to be kept confidential by federal law or regulations or state statutes; * * *

{¶ 43} "If a public body holds an executive session to consider any of the matters listed in divisions (G)(2) to (7) of this section, the motion and vote to hold that executive session shall state which one or more of the approved matters listed in those divisions are to be considered at the executive session."

{¶ 44} Here, Steingass asserts that since the board declared an "executive session" to obtain legal advice not related to any pending litigation, it violated R.C. 121.22(G) because such a reason is not a recognized exception to the general rule that all "meetings" be open to the public. Moreover, it contends that the board may not raise as a defense the fact that its "executive session," undertaken with the attendance of its lawyer, qualifies as a communication statutorily protected "privileged or confidential"[15] and a permissible executive session under R.C. 121.22(G)(5). In support of this argument, Steingass directs us to *State ex rel. Cincinnati Enquirer v. Hamilton Cty. Bd. of Commrs.,*[16] which states at ¶ 22:

{¶ 45} "R.C. 121.22(G)(5) refers to matters that are 'required' to be kept confidential. The commissioners, however, are under no legal duty to assert the attorney-client privilege to keep confidential every discussion that they may have with the prosecuting attorney. * * * '[T]he General Assembly, in limiting the circumstances in which such a discussion can be held in executive session, has required a partial waiver of the privilege by the client-public body.' * * * The exception in R.C. 121.22(G)(5) is intended, rather, to allow the commissioners to convene an executive session to discuss matters that they are *legally bound* to keep from the public * * *."[17] (Emphasis sic.)

{¶ 46} *Cincinnati Enquirer,* however, involved the decision of the Hamilton County Board of Commissioners to hire a special counsel to investigate allegations of abuses and excessive cost overruns associated with the construction of Cincinnati's Paul Brown Stadium. It involved a fact scenario where a decision

---

15. R.C. 2317.02 and R.C. 149.43.

16. Hamilton App. No. C–010605, 2002-Ohio-2038, 2002 WL 727023.

17. Id.

behind closed doors should have been made publicly, and state law regarding legal privilege did not apply.

{¶ 47} R.C. 121.22(B)(2), however, defines "meeting" as "any prearranged discussion *of the public business of the public body* by a majority of its members."[18] (Emphasis added.) The statute further states: "(H) A resolution, rule, or *formal action* of any kind is invalid unless adopted in an *open meeting* of the public body."[19] (Emphasis added.)

{¶ 48} "* * * [S]ubsection (H) makes it clear that in order to show a violation of the 'open meeting' rule as appellant attempts to do here, either a resolution, rule or formal action of some kind must have been adopted by the public body at a meeting not open to the public. Thus, the logical inference stemming from section (H) is that any activity *not* qualifying as either a rule, resolution or formal action does not have to be adopted at an open meeting in order to be valid."[20]

{¶ 49} "The nature and purpose of R.C. 121.22 support the interpretation that the statute is intended to apply to those situations where there has been actual formal action taken, to wit, formal *deliberations* concerning the public business. Ohio's courts have recognized that information-gathering and fact-finding are essential functions of any board, and that the gathering of facts and information for ministerial purposes does not constitute a violation of the Sunshine Law.[21]

{¶ 50} "Similarly, in the case of *Theile v. Harris*,[22] the court ruled that a meeting between the county prosecuting attorney and a majority of a board of township trustees, although unadvertised, was not a violation of the Sunshine Law because the meeting was strictly of an investigative and information-seeking nature, and did not involve actual deliberations of public business."[23] (Footnotes added.)

{¶ 51} Although Rookard, Nobel, Smith, and Bonner did not specifically recall what was discussed during the executive sessions of August 28 or September 25, 2001, both Love and Buchanan established that no deliberative processes took

---

**18.** Id.; see, also, *Manogg v. Stickle* (Dec. 29, 1999), Licking App. No 99–CA 56, 2000 WL 1483, citing *Holeski v. Lawrence* (1993), 85 Ohio App.3d 824, 829, 621 N.E.2d 802.

**19.** Id.

**20.** *Manogg,* supra, citing *Holeski,* supra, 85 Ohio App.3d at 829, 621 N.E.2d 802.

**21.** See *McIntyre v. Ashtabula Cty. Bd. of Commrs.* (Sept. 12, 1986), Ashtabula App. No. 1269, 1986 WL 10021.

**22.** (June 11, 1986), Hamilton App. No. C–860103, 1986 WL 6514.

**23.** *Holeski,* supra, 85 Ohio App.3d at 829, 621 N.E.2d 802.

place.[24] Each testified that the discussions related to the board's lawsuit with East–West Construction, properly discussed in private under R.C. 121.22(G)(3), and the lawyer's generic legal advice about the board's rights and responsibilities when deciding whether to award a contract to a potential low bidder.

{¶ 52} Accordingly, the record demonstrates that any request for hypothetical, informational legal advice the board submitted to Buchanan in the "executive sessions" clearly falls outside the matters R.C. 121.22 was passed to preserve— the public decision-making process of the board. No evidence was presented that demonstrated that any deliberative process took place notwithstanding the assertion in the minutes that contractual matters were going to be discussed in private. The minutes mischaracterize reasons for the executive sessions. Where a limited topic was to inform the board using general, nonspecific legal advice, such counsel was not given to influence a decision and did not taint the decision to award the contracts to Katz and Communale. We find no error in a finding that Steingass failed to prove by a preponderance of the evidence that the board violated Ohio's open meetings law. This assignment of error is overruled.

<div align="right">Judgment affirmed.</div>

KENNETH A. ROCCO, P.J., and PATRICIA A. BLACKMON, J., concur.

</div>

---

24. Rookard was not present at the August 28th meeting.