MONARCH CONSTRUCTION COMPANY et al., Appellees,

v.

OHIO SCHOOL FACILITIES COMMISSION et al., Appellants.

Monarch Construction Company et al., Appellees,

v.

Ohio School Facilities Commission et al., Appellees; Tri–Village School District and Peterson Construction Company, Appellants.

[Cite as *Monarch Constr. Co. v. Ohio School Facilities Comm.*, 150 Ohio App.3d 134, 2002-Ohio-6281.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 02AP–635 and 02AP–636.

Decided Nov. 19, 2002.

Schottenstein, Zox & Dunn, Roger L. Sabo and Patrick A. Devine, for Monarch Construction Company.

Betty D. Montgomery, Attorney General, Michael R. Gladman and Dan Belville, Assistant Attorneys General, for Ohio School Facilities Commission.

Bricker & Eckler, Jack Rosati Jr. and Sylvia Lynn Gillis, for Tri–Village School District.

Kegler, Brown, Hill & Ritter, Donald W. Gregory and Christopher J. Weber, for Peterson Construction Company.

Richard J. Dickinson, for amicus curiae Ohio School Boards Association.

———————

Per Curiam.

{¶ 1}   Defendants-appellants, Tri–Village Local School District ("Tri–Village"), the Ohio School Facilities Commission ("OSFC"), and Peterson Construction Company ("Peterson"), appeal from a judgment of the Franklin County Court of Common Pleas that (1) found that Tri–Village and OSFC abused their discretion in rejecting the bid of plaintiff-appellee, Monarch Construction Company ("Monarch"), (2) enjoined any payments to Peterson, and (3) ordered that the contract at issue either be awarded to Monarch or be re-bid.   Because the trial court erred in concluding that Tri–Village and OSFC abused their discretion in rejecting Monarch's bid, we reverse.

{¶ 2}   In 2000, Tri–Village applied for a grant under OSFC's Exceptional Needs Program to fund the renovation and expansion of their kindergarten through twelfth grade building.   The program provides financial assistance to school districts for school building repair and construction based on need and the condition of school facilities.   The grant ultimately was awarded and OSFC agreed to fund 60 percent of the cost of a new facility for Tri–Village's project. At an election held on November 7, 2000, the voters in Darke County, Ohio, where the school is located, approved a bond issue to help pay for the work. Once Tri–Village secured the money for the project, OSFC entered into a written Project Agreement with Tri–Village pursuant to R.C. 3318.08 for the construction, including renovations and additions to both the middle and high schools to house kindergarten through twelfth grades.

{¶ 3}   Tri–Village then advertised for and received construction bids for the project, and it selected Fanning/Howey Associates, Inc. as the architect for the project.   According to the project agreement, OSFC was required to select a construction manager for the project, and it chose Turner Construction ("Turner").

{¶ 4}   In February 2002, Tri–Village advertised for bids on the general trades package, the subject of this action, as well as the electrical, plumbing, and HVAC packages on the project.   The bids were opened on March 5, 2002.   At that time, Monarch was the apparent low bidder for the general trades package, and Peterson was the apparent second low bidder.   Pursuant to Section 2.6.4 of the construction manager agreement, Turner investigated the responsibility of bidders in order to make a written recommendation from the construction manager

and the project architect to Tri–Village concerning the award of the construction contracts.

{¶ 5}   Ultimately, Turner recommended that Tri–Village determine that Monarch was not a responsible bidder for the project.   Thereafter, Dr. Lucian Szlizewski, the superintendent for Tri–Village, telephoned Phil Satterfield, the superintendent of the Paint Valley School District ("Paint Valley"), to corroborate the information Denny Humbel, Turner's project executive, had relayed to him concerning Monarch's poor performance of its contract for Paint Valley's school construction project.   Dr. Szlizewski prepared a memo for Tri–Village, outlining the information from Satterfield and his discussions with Turner, and recommended that Tri–Village determine that Monarch was not the lowest responsible bidder.   Tri–Village agreed.   Monarch protested the determination.

{¶ 6}   In response to Monarch's protest, a protest meeting was held on April 3, 2002.   Humbel presented the information he gathered in his investigation.   Dr. Szlizewski indicated that he personally felt a site visit was extremely important, noting that the school project was very important in their community and that it was the only school to be built in the foreseeable future.   He further stated that he considered the opinion of another superintendent to be very relevant in his decision-making process.   While Dr. Szlizewski acknowledged that he did not have to follow Turner's recommendation that Monarch was not responsible, he also indicated that he had faith in Humbel's ability to make a good recommendation.   Tom Butler, the president of Monarch, had the opportunity to provide a detailed history of his company, including the number of projects it had performed, the amount of business the company did each year, Monarch's explanation for the unfavorable reports of its work at Paint Valley, and the views of various contractors it had worked with on other school projects.

{¶ 7}   Following the protest meeting, Turner again recommended that Monarch be found not to be responsible, and Tri–Village agreed.   Tri–Village sent Monarch a letter informing it that the contract would not be awarded to it because Monarch had been found not to be responsible.   In a letter dated April 10, 2002, that was signed by Randall Fischer, the executive director of OSFC, OSFC approved the decision of Tri–Village to reject Monarch and award the contract to Peterson.

{¶ 8}   In response, Monarch filed an action in the Franklin County Court of Common Pleas against Tri–Village and OSFC challenging Monarch's rejection and the award to Peterson of the general trades contract for the Tri–Village project.   Monarch subsequently amended its complaint and added Peterson as an additional defendant.   The complaint sought a declaration that the actions of Tri–Village and OSFC in rejecting Monarch and awarding the contract to Peterson were contrary to law, and it further requested an injunction to prevent the award

of the contract and any payments to Peterson for work done on the project. The trial court issued a temporary restraining order on April 17, 2002.

{¶ 9} The trial court consolidated the hearing on the application for preliminary injunction with the trial on the merits. At the trial, evidence was presented concerning Monarch's poor performance on the project at Paint Valley. Witnesses for Monarch presented testimony identifying reasons for the poor performance that did not relate directly to Monarch.

{¶ 10} In addition, the trial court heard evidence concerning OSFC and the failure of its members to individually vote on and approve Tri–Village's contract with Peterson. Instead, the three members of OSFC had delegated their voting authority to OSFC's executive director. Based on that evidence, Monarch contended that the voting members of OSFC illegally had delegated their authority to vote on and approve not only the Tri–Village contract, but any and all contracts of the OSFC.

{¶ 11} The trial court concluded that (1) Tri–Village had abused its discretion in finding that Monarch was not a responsible bidder, and (2) OSFC had acted illegally because the voting members of OSFC had never voted to approve the contract awarded to Peterson. As a result of those determinations, the trial court enjoined Tri–Village from awarding the contract to Peterson, concluding that the contract had to be awarded to Monarch or be re-bid. *Monarch Constr. Co. v. Ohio School Facilities Comm.*, 118 Ohio Misc.2d 248, 2002-Ohio-2955, 771 N.E.2d 902, and 118 Ohio Misc.2d 296, 2002-Ohio-2957, 771 N.E.2d 941. Appellants timely appeal. Tri–Village assigns the following errors:

{¶ 12} "First Assignment of Error: The trial court erred by failing to find that Monarch was estopped from arguing that Mr. Fischer lacked authority to execute legal contracts when Monarch admitted at trial that it was continuing to seek and accept payments under contracts approved and executed under identical circumstances.

{¶ 13} "Second Assignment of Error: The trial court erred by foreclosing questioning of counsel regarding the estoppel/unclean hands issue, leading counsel to believe such questioning was unnecessary because the court would find the approval authority issue a mere error of law and not an abuse of discretion, and then proceeding to find against defendant-appellants on that issue without addressing the estoppel/unclean hands defense.

{¶ 14} "Third Assignment of Error: The trial court erred by making findings of fact and conclusions of law on issues that were not properly raised at trial, thus denying appellants notice and an opportunity to be heard on such issues.

{¶ 15} "Fourth Assignment of Error: The trial court erred when it found that Executive Director Randall Fischer lacked authorization to approve the

contract award to Peterson or, alternatively, the trial court's finding, if correct, has been cured and, therefore, rendered moot.

{¶ 16} "Fifth Assignment of Error: The trial court erred by holding that Monarch was not given adequate notice of the reasons for the findings of non-responsibility and an adequate bid protest meeting.

{¶ 17} "Sixth Assignment of Error: The trial court erred by improperly substituting its judgment for that of the statutorily authorized decision-makers.

{¶ 18} "Seventh Assignment of Error: The trial court erred in holding that the perceived problems with the construction manager's review invalidated the non-responsibility determined when there was no finding of bad faith and when those perceived problems were remedied by the School Board.

{¶ 19} "Eighth Assignment of Error: The trial court erred in making numerous findings of fact and conclusions of law based on 'facts' that were not raised before the decision-makers and without supporting evidence in the record.

{¶ 20} "Ninth Assignment of Error: The trial court erred by seeking out and considering inadmissible hearsay through its own questioning at trial and by seeking out and considering information and arguments that were not made available to the Board of Education and the OSFC at the time they exercised their discretion.

{¶ 21} "Tenth Assignment of Error: The trial court erred in dismissing appellants' counterclaim, by failing to set an appropriate injunction bond and in ordering that the initial bond be released."

{¶ 22} OSFC assigns the following errors:

{¶ 23} "I. The trial court erred when it held that the Ohio School Facilities Commission was not permitted to authorize its Executive Director to approve the rejection of Monarch Construction Company as 'not responsible' and approve the award of the general trades contract to Peterson Construction Company.

{¶ 24} "II. The trial court erred by failing to properly apply the abuse of discretion standard and by improperly substituting its own judgment for the statutorily authorized decision makers, the Tri–Village Local School District and the Ohio School Facilities Commission.

{¶ 25} "III. The trial court erred when it failed to hold that Monarch Construction Company's claims were barred by the doctrine of unclean hands.

{¶ 26} "IV. The trial court erred in awarding Monarch Construction Company declaratory and injunctive relief.

{¶ 27} "V. The trial court erred in dismissing the counterclaim of Tri–Village Local School District and the Ohio School Facilities Commission."

{¶ 28} Peterson assigns the following errors:

{¶ 29} "1. The trial court erred by failing to find that Monarch was estopped from arguing the lack of approval authority by Mr. Fischer when Monarch admitted at trial that it was continuing to receive benefits under contracts approved and executed under identical circumstances.

{¶ 30} "2. The trial court erred by improperly substituting its judgment for that of the statutorily authorized decision-makers.

{¶ 31} "3. The trial court erred in finding that Monarch established, by clear and convincing evidence, that Appellants abused their discretion in finding Monarch non-responsible.

{¶ 32} "4. The trial court erred in finding that Appellants failed to comply with the notice and meeting provisions of R.C. 9.312.

{¶ 33} "5. The trial court erred in granting Monarch's claim for injunctive relief given the substantial harm to Peterson."

{¶ 34} The foregoing assignments of error resolve to three issues that this court must address: (1) whether Tri–Village abused its discretion in determining that Monarch was not a responsible bidder for purposes of the general trades contract portion of the Tri–Village project, (2) whether OSFC failed to comply with the pertinent statutory law in the procedure it employed to approve Tri–Village's contract with Peterson, and (3) whether any deficiency in that procedure renders Tri–Village's contract with Peterson unenforceable.

{¶ 35} The first issue involves our review of the trial court's conclusion that Tri–Village abused its discretion in determining that Monarch was a not responsible bidder for the Tri–Village project. "It is well established that courts should take '[p]articular caution in granting injunctions, especially in cases affecting a public interest where the court is asked to interfere with or suspend the operation of important works or control the action of another department of government.'" *Cleveland Constr., Inc. v. Ohio Dept. of Adm. Serv., Gen. Serv. Adm.* (1997), 121 Ohio App.3d 372, 383, 700 N.E.2d 54. "[T]o prevail on a complaint seeking injunctive relief with respect to the award of a public contract, [the contractor] must prove by clear and convincing evidence that the award constituted an abuse of discretion and resulted in some tangible harm to the public in general, or to [the contractor] individually." Id. at 384, 700 N.E.2d 54. The term "abuse of discretion" connotes more than just an error of law; it exists where the court's attitude, as evidenced by its decision, was unreasonable, arbitrary or unconscionable. See *Dayton ex rel. Scandrick v. McGee* (1981), 67 Ohio St.2d 356, 21 O.O.3d 225, 423 N.E.2d 1095; *Cleveland Constr.,* supra. Accordingly, the trial court was required to review the evidence that was before Tri–Village at the time Tri–Village decided Monarch's status, and determine

whether Tri–Village, based upon the evidence before it, abused its discretion in rejecting Monarch as the lowest responsible bidder. Instead, the record indicates the trial court substituted its judgment for that of Tri–Village.

{¶ 36} Under R.C. 3318.10, Tri–Village is authorized to advertise for construction bids in accordance with R.C. 3313.46. Pursuant to R.C. 3318.10 and 3313.46(A)(6), Tri–Village is to award the contract to the lowest responsible bidder and has the discretion to reject all bids and readvertise. Any contract Tri–Village awarded required the approval of OSFC. See R.C. 3318.10.

{¶ 37} The parties agree that, pursuant to R.C. 9.312(A), "[t]he factors that the state agency or political subdivision shall consider in determining whether a bidder on the contract is responsible include the experience of the bidder, his financial condition, his conduct and performance on previous contracts, his facilities, his management skills, and his ability to execute the contract properly." According to Section 2.6.4 of the construction management services agreement, the construction manager was to assist Tri–Village in determining to whom the contract should be awarded: "The Construction Manager * * * shall * * * deliver a written recommendation of the Construction Manager and the Architect to the School District Board about the award of, or rejection of, any bid or bids for each Contract for the Project in accordance with the applicable law."

{¶ 38} Here, the construction manager, Turner, employed Denny Humbel as the project executive. Humbel was responsible for investigating Monarch, who was the apparent low bidder on the project. Humbel stated at the protest meeting that he investigated five projects Monarch had been involved in, including Huntington, Paint Valley, Scioto Valley, Adena, and Minford. Humbel further stated that Tom Kerth, Dave Holt, and John Cissell also participated in the investigation in various ways.

{¶ 39} Humbel listed three main reasons for rejecting Monarch, all of which resulted from Monarch's poor performance on the Paint Valley project: (1) the apparent poor performance of Monarch in managing the conduct and performance of its subcontractors, (2) doubt about Monarch's fully understanding the Tri–Village project as evidenced by its failure to make an onsite evaluation, and (3) the availability to Monarch of qualified people for the Tri–Village project. At both the protest meeting and before the trial court, Humbel indicated that other, smaller factors, were part of his recommendation, including Humbel's belief that Monarch had some problems with other projects, though to a lesser degree than Monarch encountered at Paint Valley.

{¶ 40} The trial court determined that Tri–Village abused its discretion in rejecting Monarch's bid because of the procedures Turner and Tri–Village employed in investigating Monarch. In support of its conclusion, the trial court

noted that Humbel did not indicate on his evaluation forms whether the interviewee would recommend Monarch for another project.

{¶ 41} Humbel, as well as other Turner employees, made several telephone calls during the investigation of Monarch. Although Humbel used a contract evaluation form that was downloaded from the OSFC website, Humbel did not read that evaluation form verbatim during his telephone interviews. Instead, he asked questions of the interviewee and then gave his subjective numerical interpretation of his reply. Humbel's numerical responses differed from the actual responses that Monarch received when it personally submitted the evaluation forms to the individuals Humbel interviewed, but the comments Humbel wrote on the evaluation forms mirrored the conversations he had had with the interviewees.

{¶ 42} The omission the trial court noted is evident on only one of the two evaluation forms that both Humbel completed and the interviewees themselves completed at Monarch's request. Specifically, after interviewing Jeremy Ayers and Neil Uhris concerning the Huntington project, Humbel recorded on the evaluation form that both Ayers and Uhris indicated that they would use Monarch again. See Exhibit 9C. Monarch's Exhibit 23F indicates the same. Only in Exhibit 9B, which includes Humbel's evaluation after interviewing Scott Grooms regarding the Adena project, does Humbel not indicate that he asked Grooms whether he would work with Monarch again. However, Monarch's Exhibit 23E, a form Grooms himself completed, indicates that Grooms would recommend Monarch for a project. The minor discrepancy is insignificant to Tri–Village's ultimate decision to reject Monarch's bid.

{¶ 43} The trial court also was critical of the elements of the investigation Turner's employees, and particularly Humbel, performed. Citing to *Cleveland Constr.*, the trial court noted that the director of administrative services, who reviews contracts for the entire state of Ohio, has a committee to conduct contract investigation and has standardized forms and standardized questions to be asked during the investigation process. In short, the trial court apparently determined that the standard set forth in *Cleveland Constr.* should have been followed in this case.

{¶ 44} Contrary to the trial court's conclusion, *Cleveland Constr.* does not suggest that the investigation procedures Turner employed were deficient. While *Cleveland Constr.* concluded that the director of administrative services did not abuse his discretion in finding that Cleveland Construction was not the lowest responsible bidder for that contract, *Cleveland Constr.* does not state or even suggest that all competitively bid contracts must be bid in accordance with the procedures the director of administrative services used.

{¶ 45} Moreover, although the trial court determined that, based upon the information Turner originally conveyed to Tri–Village, Tri–Village did not abuse its discretion in rejecting Monarch in the first instance, the trial court concluded that Tri–Village abused its discretion in not reversing its decision after the protest meeting. As the trial court explained, Tri–Village could not reject Monarch as the lowest responsible bidder based solely on Monarch's poor performance on the Paint Valley project. Relying again on *Cleveland Constr.*, the trial court noted that Cleveland Construction had problems performing on several contracts, while Turner's investigation revealed that Monarch had problems with only one contract. Believing that Tri–Village was arbitrary in rejecting Monarch because of problems involving one contract, the trial court determined that Tri–Village should have weighed the four properly performed contracts against the one that was poorly performed.

{¶ 46} Contrary to the trial court's conclusion, neither *Cleveland Constr.* nor pertinent statutory provisions require such a weighing process. R.C. 9.312 required Tri–Village to consider certain factors in determining whether Monarch was the lowest responsible bidder, including Monarch's conduct and performance on previous contracts. The record indicates that Turner investigated those and provided Tri–Village with information concerning Monarch's performance on five contracts. Because, however, Paint Valley was a recent project and was similar to the Tri–Village project, Turner recommended, and Tri–Village agreed, that Monarch should be rejected as the lowest responsible bidder.

{¶ 47} Because Tri–Village systematically investigated Monarch through Turner and based its decision on the information it received through the investigation Turner conducted, Tri–Village's decision to reject Monarch was not arbitrary, even though it was not undertaken with the same procedures used in *Cleveland Constr.* Instead of imposing rigid procedures on school boards in circumstances like those at issue, the law grants school boards considerable discretion. As the Supreme Court explained in *Hancock Cty. Bd. of Edn. v. Moorehead* (1922), 105 Ohio St. 237, 136 N.E. 913, in its review of a school board's decision to build a new school house rather than repair and renovate two older buildings, "[t]he board of education here, in the exercise of its discretion, determined to build a new schoolhouse to take the place of the schools of the district. Its action in that respect may or may not have been wise, but it was acting within the power vested in it by law, and it is not within the province of a court, because perchance that court if acting as a board would have exercised that discretion in a different way, to substitute its judgment for the judgment of the board invested by law with the duty and responsibility of exercising its discretion and determining the needs and requirements of the district under its supervision." Id. at 245, 136 N.E. 913.

■ {¶ 48} Contrary to the discretion the law affords Tri–Village, the trial court seemingly did not apply an abuse-of-discretion standard in reviewing Tri–Village's decision to reject Monarch's bid. Rather, the trial court wrongly concluded that Tri–Village was required to utilize the same investigation procedures that the director of administrative services used in *Cleveland Constr.* As a result of that conclusion, the trial court ultimately substituted its judgment for the judgment of Tri–Village in determining whether Monarch was the lowest responsible bidder, instead of allowing Tri–Village to weigh the evidence and come to its own conclusion. In reaching that determination, the trial court further erred in allowing and inviting evidence that was not before Tri–Village following the protest meeting. If the abuse-of-discretion standard permitted that kind of hindsight, the discretion of the school boards indeed would become virtually nonexistent. Tri–Village, through Turner, adequately investigated Monarch and based its decision on the information gathered. Moreover, that information supports Tri–Village's decision. Accordingly, the following assignments of error are sustained: Tri–Village's third, sixth, seventh, eighth, and ninth, OSFC's second, and Peterson's second and third.

■ {¶ 49} The trial court also had determined the notice sent to Monarch was defective and that, as a result, Monarch was not given the opportunity to present its case at the protest meeting. Although Tri–Village did not properly advise Monarch of the reasons Monarch was found not to be the lowest responsible bidder, the protest meeting transcript reflects that the lack of proper notice did not prejudice Monarch. Instead, Monarch presented a significant amount of information to rebut and refute the claims concerning its poor performance on the Paint Valley project. Indeed, Monarch's president, Tom Butler, stated that he had no additional evidence he needed to submit at the protest meeting. Accordingly, Tri–Village's fifth and Peterson's fourth assignments of error are sustained.

■ {¶ 50} The second and third issues involve OSFC's procedure in approving Tri–Village's contract with Peterson, and OSFC's subsequent ratification of the contract. In its decision and entry, the trial court arguably was correct in concluding that OSFC has failed to follow the specific mandates of the law in approving contracts, as the voting members of OSFC did not vote to approve the contract awarded to Peterson, but instead delegated the authority to OSFC's executive director. However, even if the trial court were correct in its conclusion regarding OSFC's approval of the contract, the ramifications of that legal discrepancy are not as the trial court determined.

{¶ 51} The trial court concluded that the contract with Peterson signed by the president and treasurer of Tri–Village is void ab initio. With no valid contract between Tri–Village and Peterson, the trial court enjoined payments to Peterson

for its work on the Tri–Village project. Contrary to the trial court's conclusion, the contract between Tri–Village and Peterson was voidable, not void ab initio. As a result, the action of OSFC to ratify the contract, taken after the trial court's decision, is permissible and lawful.

{¶ 52}  Pursuant to R.C. 3318.10, the contract between Tri–Village and Peterson was to be made in the name of the state of Ohio and executed on its behalf by the president and treasurer of Tri–Village. The contract at issue was so executed, and thus does not require a signature from OSFC. Instead, OSFC's responsibility was to determine whether to approve the contract Tri–Village awarded.

{¶ 53}  On those facts, the case of *State v. Exr. of Buttles* (1854), 3 Ohio St. 309, 1854 WL 13, is instructive, as the court stated, "When the agents of the State exceeded their authority, the State had its option to ratify their acts or repudiate the contract they had made in its name; but when it elected to ratify, it assumed all the obligations of the contract from its reception, and was entitled to all its benefits. If the State could have lawfully made the contract at the time and under the circumstances it was made, it could lawfully adopt the one made in its name by those who assumed to act as its agents.  * * * In short, any contract that an individual, or body corporate or politic, may lawfully make, they may lawfully ratify and adopt, when made in their name without authority;  and when adopted, it has its effect from the time it was made, and the same effect as though no agent had intervened." Id. at 322–323.

{¶ 54}  Here, had OSFC and its voting members actually considered and approved the contract, the contract unquestionably would be valid and enforceable because the contract is one that lawfully could have been made at the time and under the circumstances it was made. Further, because the school board had the authority to enter into the contract and OSFC had the authority to approve the contract, and given that the performance of the contract was not for an illegal or immoral purpose, OSFC could ratify the contract. See *Buttles,* supra.  OSFC took the steps necessary to properly ratify Tri–Village's contract with Peterson, as well as other contracts that arguably were in jeopardy. As a result, Tri–Village's fourth, OSFC's first and fourth, and Peterson's fifth assignments of error are sustained.

{¶ 55}  Accordingly, Tri–Village's third, fourth, fifth, sixth, seventh, eighth, and ninth assignments of error are sustained;  OSFC's first, second, and fourth assignments of error are sustained;  and Peterson's second, third, fourth, and fifth assignments of error are sustained. Because of the foregoing disposition of the noted assignments of error, Tri–Village's first, second, and tenth assignments of error, OSFC's third and fifth assignments of error, and Peterson's first assignment of error are all rendered moot. The judgment of the Franklin

County Court of Common Pleas is reversed, and this matter is remanded with instructions to enter judgment for appellants.

*Judgment reversed and*
*cause remanded with instructions.*

TYACK, P.J., DESHLER and PEGGY BRYANT, JJ., concur.