OPINION
{¶ 1} Defendant-appellant, the Ohio Department of Administrative Services ("DAS"), appeals from a judgment of the Ohio Court of Claims finding DAS to be in breach of its contract with plaintiff-appellee, System Automation Corporation ("SAC"), for SAC to provide software programs and other services to the state.
 {¶ 2} In 1997, DAS formulated a plan to obtain a single computer database system for processing and tracking licenses issued by all of the state professional boards to their licensees. Apparently, at that time, each of the 21 state boards employed its own data gathering and processing system, and there was no uniformity in the manner in which the various boards obtained, used and stored information pertinent to their licensees. In addition, DAS had concerns that computer programs then being utilized were not "Y2K" compliant, thus possibly rendering them obsolete after 2000. Under the direction of then DAS Chief Information Officer Peter McGeoch, Neal Kaffen, who was at that time Data Systems Manager for DAS, oversaw the project and was the lead person representing the state during the process of determining system requirements, drafting a proposal, contacting vendors, selecting a vendor, and conducting contract negotiations. Under Kaffen's direction, DAS ultimately settled upon SAC, a Maryland software development company specializing in providing products and professional services to both the federal and state governments. SAC had successfully marketed its program, known as License 2000, to other state governments, and, according to Charles Rubin, its president and CEO, License 2000 was being used to manage close to 20 million licensees throughout the United States. DAS hired an independent contractor, Tom Betts, to be the day-to-day manager of the project, to act as a liaison to the licensing boards, and to work closely with Jeff Cohen, SAC's project manager, in implementing the contract.
 {¶ 3} The parties drafted a contract, which was signed in December 1998. Under the timeline proposed by the contract, the system would be installed and fully operational by December 16, 1999, with the final system acceptance payment to be due on December 30, 1999. Thus, the contract contemplated that both parties would have performed their duties under the contract before the end of 1999. The contract was signed by both Rubin and by DAS Director Sandra A. Drabik, and provided, in pertinent part:
Composition of Contract. This Contract consists of the terms and conditions in this agreement, including the work and activities set forth in the Scope of Work, Timeline and Payment Schedule labeled Exhibit I, which is attached hereto, and incorporated by reference as if fully written herein.
Time of Performance. This Contract is effective upon the date of signature by the State, or upon the issuance of a valid purchase order, whichever is later in time. This contract remains in effect until the work described in Exhibit I is completed to the satisfaction of the State and the Contractor is paid in accordance with the Article entitled "Payment Schedule" in this Agreement and the payment plan included in Exhibit I, or until terminated as provided in the Article entitled Cancellation and Termination in this Agreement.
The term of state of Ohio contracts may cross the state biennium. Therefore, this contract must terminate June 30, 1999. If the State or the Contractor have continuing obligations under this Contract, the State may renew this Contract on the same terms, conditions, and pricing in a new biennium by giving written notice to the Contractor prior to July 1, 1999. Renewal may not extend beyond the expiration of the next biennium.[1]
 {¶ 4} Under the plan negotiated by the parties, SAC would obtain specifications from the various boards and would formulate this information into a "functional description" which it would then use to customize its software to fit the boards' needs. Once the software was ready, SAC would assist DAS in loading it and being certain that it worked properly. The various stages of the project would be identified as separate "deliverables," which DAS would have 30 days to review and accept, upon which DAS would become obligated to pay SAC. When working with other states on similar projects, SAC had been responsible for converting data from the pre-existing programs into the format required for use of License 2000; however, when DAS learned that $80,000 could be saved by having state employees perform this task, DAS and SAC reached an agreement whereby this portion of the project would be undertaken by DAS.
 {¶ 5} From the outset, it became clear that many of the licensing boards were not prepared to timely cooperate with the project. The boards had questions about how the software would meet their needs, and issues regarding whether the accessibility of some of the information to be placed in the database would violate licensees' privacy. Different boards needed access to different types of data, and expressed concern that a uniform system would not meet their individual needs. Some of the boards felt they were being rushed into the project without adequate opportunity to assess exactly what type of system would work for them. Kaffen stated he surmised some of the boards did not trust his oversight of the project, and board members may have resented DAS having control over their information technology decisions.
 {¶ 6} Although SAC was able to deliver the functional description on time in June 1999, confusion and reluctance on the part of the boards resulted in DAS not formally accepting that deliverable until December 1999, long past the 30 days given DAS to do so under the contract. Because of this delay, only two of the seven total deliverables made by SAC were actually made during 1999: the perpetual license and the functional description.
 {¶ 7} Despite the fact that the contract gave June 30, 1999 as its termination date, and contemplated completion by the end of 1999, SAC continued to provide, and DAS continued to accept and pay for, additional deliverables throughout 2000. Thus, SAC delivered components of the project consisting of prototype development, software development customization, documentation development, conversion utilities, and Citrix Metaframe. In March 2000, Cohen sent a revised timeline to Betts indicating a completion date of January 2001 (Plaintiff's Exhibit 30), and at least one status report prepared by Betts appears to acknowledge DAS's acquiescence in the timeline revisions. (Plaintiff's Exhibit 36.) Although SAC notified DAS that the customized software was ready in July 2000, which was earlier than specified in the revised timeline, DAS declined to accept the deliverable at that time because DAS was not ready. In the fall of 2000, DAS Assistant Director/Chief Information Officer Gregory Jackson informed SAC that the project was considered to be "at risk" because of being behind schedule, but no mention was made that the project might be "at risk" because the parties were working without a valid contract. In November 2000, SAC arrived on schedule to assist DAS employees in installing the new program and in setting up computer work stations to allow DAS employees to begin data conversion as the parties had contracted for DAS to do; however, although DAS had set up a room full of computer terminals for this purpose, it had not supplied computers which were adequate to the task, and DAS admits that these shortcomings and problems caused a further delay in SAC's performance of the contract.
 {¶ 8} By the end of 2000 and the beginning of 2001, several things became clear: first, the project was far from complete, and the timeline needed to be revised. Second, delays caused by DAS resulted in SAC incurring increased costs for which SAC would want additional compensation. Third, funds appropriated for this project needed to be disbursed in 2000, thus DAS believed it would need further approval from the State Controlling Board to complete the project and make additional payments in 2001. By letter dated November 7, 2000, Jackson apparently acknowledged that the initial contract had been extended by a revised project plan. The letter addressed to Rubin stated:
In response to your correspondence dated July 26, 2000, the Ohio License 2000 Project will remain designated as an "at risk" project. Per our meeting on July 25, 2000, I indicated that a project may receive the "at risk" designation due to one or more reasons, 1) behind schedule, and/or 2) over budget. While the project currently is not over budget, the fact that License 2000 was designated as a Year 2000 initiative with an original completion date of December 30, 1999 certainly qualifies it as behind schedule.
It is my understanding that pursuant to the contract entered into on December 15, 1998; System Automation submitted a project timeline projecting project completion by December 30, 1999; in time for Year 2000. Furthermore, on March 13, 2000, System Automation submitted a revised project plan projecting project completion by January 12, 2001.
Although attempting to accommodate the expectations of over 20 board and commission entities may be challenging, there exists a lack of proper management of those expectations, and therefore, an increased risk in achieving user acceptance. As an experienced provider of information technology solutions, I am sure you recognize the importance of change management.
To ensure proper oversight toward project implementation and contractor management, effective immediately, I have assigned the License 2000 project to Donald Bishop — Deputy Director for IT Service Delivery. You are to receive all project direction from Don. The current project manager, Tom Betts, will report directly to Don as well. You should arrange a detailed briefing for Don on the current status of the project as soon as possible.
The State of Ohio looks forward to fulfilling the much needed information technology functionality our boards and commissions community seeks through the successful implementation of the License 2000 project.
(Plaintiff's Exhibit 47.)
 {¶ 9} Reviewing all the correspondence between the parties during this period, it would appear that the timeline extensions and other oral agreements the parties had been following no longer served their purposes. Thus, each side contemplated that further negotiations and agreements were needed before the project could be completed.
 {¶ 10} In addition to these problems, some of the licensing boards continued to be dissatisfied with the choice of SAC as a vendor, and additionally preferred a software program allowing them to add internet access as a feature of the database. Internet access had not been contemplated in the original contract, and would be more costly for SAC to provide; thus, adding this feature would make the project more expensive and would set its parameters beyond those contemplated by the original agreement. The licensing boards indicated their intent to oppose any action by the State Controlling Board to approve funding for a new contract which did not meet this new specification, thus, DAS's ability to secure additional funding in order to complete the project appeared to be in jeopardy.
 {¶ 11} With all of these obstacles in their way, the parties were not able to reach an agreement on a new contract, although throughout the negotiations SAC continued to perform tasks and supply deliverables in furtherance of the project. On June 19, 2001, DAS Deputy Director Don Bishop notified SAC President Rubin that it was abandoning the project. By that time, SAC had additionally delivered and received payment for the prototype and the Citrix Metaframe, and had delivered but not been paid for the software customization, documentation development, conversion utilities, and user training. DAS also never paid for retainage on all deliverables, which SAC claims it was entitled to receive under the contract. Upon failing to receive any response from DAS when SAC attempted to obtain compensation for its accepted deliverables, SAC commenced an action for breach of contract in the Court of Claims in November 2001.
 {¶ 12} In August 2003, that court issued a decision in favor of SAC. In its decision, the court addressed arguments by DAS that, prior to the contract expiring in June 1999, the state was required to give written notice of renewal, which it did not do, and that, subsequent to expiration of the contract, DAS was not authorized to negotiate a new contract absent State Controlling Board approval. Rejecting both arguments, the court stated:
* * * After reviewing the numerous written and electronic communications exchanged by the parties and taking into consideration their ongoing collaborative relationship, the court is persuaded that defendant renewed the contract prior to its expiration. In March and May 1999, DAS advised SAC to proceed with the project and DAS requested that, due to the holiday season, changes to the time-line be made which pushed completion into the first few months of 2000. * * * Thus, DAS not only approved a time-line that extended well beyond June 30, 1999, it also directed SAC to continue working on the project over the ensuing 18 months. DAS accepted components as they were delivered and actively participated in revising time-lines; revisions often necessitated by delays caused by the inability of DAS to coordinate the plan among the users or to convert the data into a usable format.
* * * In the instant case, the preponderance of the evidence and testimony presented at trial establishes that from July 1, 1999, through at least November 2000, both parties were operating under the belief that a contract existed. * * *
* * * It is undisputed that the Controlling Board approved the initial contract and that it authorized DAS to renew the contract under the same terms and conditions. * * * While it is also undisputed that the parties never created a new contract with different terms, this court has already determined that the initial contract was renewed according to its terms and the court concludes that such renewal was within the authority of DAS.
* * *
Upon review of all the evidence submitted, the court is convinced that DAS made a grievous mistake when it chose to assume responsibility for the data conversion as a means to lower the overall cost of the project. It is clear to the trier of fact that DAS and its employees were not qualified to perform the data conversion under the parameters set by the contract or the deadlines imposed by the time-line. The inability of DAS to convert the data along with the lack of integration among the various agencies created significant delays for plaintiff. * * * Indeed, the court attributes the failure to complete the project to the inept leadership of the project management provided by DAS. * * *
 {¶ 13} Thus, the court found DAS to be in breach of contract and rendered judgment in favor of SAC.
 {¶ 14} DAS now assigns the following as error:
The Court of Claims Erred By Finding That The Ohio Department Of Administrative Services "Renewed" Its Contract With System Automation Corporation And/Or By Finding That Mid-Level DAS Employees Created An "Implied-In-Fact" Contract.
 {¶ 15} The core issue in this matter is whether actions and communications by DAS prior to June 30, 1999, which appeared to indicate DAS's intention to renew the contract, were sufficient to establish a renewal in accordance with Ohio law. DAS argues only a written renewal by the director of DAS prior to July 1, 1999, could constitute a renewal of the contract by its terms. By DAS's reasoning, the fact that both parties continued to operate as if the contract were still in effect, and that they revised time lines to accommodate performance well after the end of 1999, did not constitute a renewal because DAS provided no written communication signed by its director stating DAS's intent to renew.
 {¶ 16} The meaning of a written agreement is to be ascertained from the language of the agreement. Blosser v.Enderlin (1925), 113 Ohio St. 121, paragraph one of the syllabus. The construction and interpretation of a written contract to determine whether the terms are ambiguous and, thus, require extrinsic evidence to ascertain its meaning is a question of law. Alexander v. Buckeye Pipe Line Co. (1978),53 Ohio St.2d 241, paragraph one of the syllabus. If the terms are not ambiguous on their face, the court will construe them by giving them their plain and ordinary meaning. Olmstead v. LumbermensMutl. Ins. Co. (1970), 22 Ohio St.2d 212. Although questions of law are subject to de novo review on appeal, the trial court's findings of fact are entitled to deference and will not be overturned so long as supported by competent, credible evidence.Sherman R. Smoot Co. of Ohio v. Ohio Dept. of Adm. Serv.
(2000), 136 Ohio App.3d 166, 172. Government contracts, like those between individuals, should be interpreted "`with a view to ascertaining the intention of the parties and to give it effect accordingly, if that can be done consistently with the terms of the instrument.'" SM Constructors v. Columbus
(1982), 70 Ohio St.2d 69, 71, quoting Hollerbach v. UnitedStates (1914), 233 U.S. 165, 171-172.
 {¶ 17} In the case at bar, DAS argues that it did not issue a written notice of renewal of the contract on the same terms and conditions as the original contract before June 30, 1999, thus, the contract expired on that date. In addition, DAS contends that words or conduct between the parties after that date neither operated as a renewal of the contract nor the formation of a new contract because the persons dealing with SAC at that time were mid-level and low-level DAS employees or independent contractors who were not authorized to bind the agency. According to DAS, SAC understood both that the contract could not go past the biennium and that a renewal would require written notice from the director herself, so that SAC was not entitled to rely on any words or acts of DAS that may have suggested the contract was renewed or was impliedly extended. Thus, DAS urges the risk of loss must fall upon SAC, and directs us to Buchanan Bridge Co. v.Campbell (1899), 60 Ohio St. 406, supporting the notion that contractors who do not ascertain the authority of government representatives to bind their principals do business with the government at their own peril.
 {¶ 18} A recent enunciation of the Buchanan Bridge
principle is set forth in Shampton v. Springboro,98 Ohio St.3d 457, 2003-Ohio-1913, a case involving a contract dispute over a lease. In that case, a city council adopted a resolution authorizing its city manager to extend a temporary lease to the plaintiff, who was seeking to operate a restaurant in the clubhouse of the municipal golf course. The contract negotiated by the city manager and the plaintiff indicated that the agreement would expire upon execution of a long-term lease, but the parties did not reach agreement on a long-term lease, and the city opted to terminate the temporary lease as well. The plaintiff sued on the basis that he had incurred substantial expense in setting up the business with the expectation of a long-term lease, and was entitled to recover under an estoppel theory. The Ohio Supreme Court ultimately found that the city manager was not authorized to bind the city to a long-term lease and so the plaintiff could not recover. Following Lathrop Co. v.City of Toledo (1966), 5 Ohio St.2d 165, the court placed upon the plaintiff the burden of determining whether the city manager was authorized to bind the city:
As a starting point, we look to Section 6.02 of the Springboro Charter, which states:
"The Manager shall have the following powers and duties:
"* * *
"(i) To arrange, prepare and sign contracts * * * but no such contracts * * * shall be legal until ratified or authorized by ordinance or resolution of the Council * * *."
* * *
"A thread running throughout the many cases the court has reviewed is that the contractor must ascertain whether the contract complies with the Constitution, statutes, charters, and ordinances so far as they are applicable. If he does not, he performs at his peril."
* * *
In summary, there was never an agreement to the terms of a long-term lease, and even if an agreement had been reached, it would be invalid because [the city manager], as evident in the charter and Resolution No. R-95-32, did not have authority to enter into a long-term lease. * * *
Id. at ¶ 22-25, 28, 36, quoting Lathrop.
 {¶ 19} In addition, the court stated, at ¶ 35:
Our decision in this case is consistent with long-held principles of this court. "`An occasional hardship may accrue to one who negligently fails to ascertain the authority vested in public agencies with whom he deals. In such instances, the loss should be ascribed to its true cause, the want of vigilance on the part of the sufferer, and statutes designed to protect the public should not be annulled for his benefit.'" * * *
 {¶ 20} Following this same line of reasoning, DAS articulates the problem in this case as one of authority. According to DAS, McGeoch, Kaffen, Betts, and others working for and on behalf of DAS were never authorized to renew the contract. Thus, according to DAS, conduct by these employees purporting to renew the contract and/or create a new contract resulted in an agreement which was void ab initio. Addressing this argument, the trial court stated, at ¶ 16:
* * * It is undisputed that the Controlling Board approved the initial contract and that it authorized DAS to renew the contract under the same terms and conditions. (Plaintiff's Exhibits 12, 60, and 79.) While it is also undisputed that the parties never created a new contract with different terms, this court has already determined that the initial contract was renewed according to its terms and the court concludes that such renewal was within the authority of DAS.
 {¶ 21} A review of statutory authority for the purchasing and contractual powers of DAS and its agents reveals that, pursuant to R.C. 124.04(K), the director of DAS is given the power, duty and authority to "appoint examiners, inspectors, clerks, and other assistants necessary in the exercise of the powers and performance of the duties and functions which the director is by law authorized and required to exercise and perform, and to prescribe the duties of all of those employees[.]" In addition, R.C. 125.021 enables the department itself to "make contracts for, operate, and superintend the telephone, other telecommunication, and computer services for state agencies." Finally, Ohio Adm. Code 125:5-1-02 provides:
(A) The director of the department of administrative services may delegate authority to the state purchasing administrator, the deputy director of the division of computer services, the state printing administrator, or as the director may otherwise delegate, to make purchases for supplies and services.
 {¶ 22} Thus, the director of DAS has broad delegation powers, and the statutes appear to contemplate that the director will not need to be directly involved with the day-to-day administration of the various duties and functions of DAS representatives when they are carrying out their duties under contracts made with outside vendors, such as SAC. Despite the fact that the director did not need to manage all aspects of this project, and although Kaffen and Betts, along with other DAS employees, appear to have been delegated much of the authority in performing this contract, some of the evidence before the trial court demonstrates that persons at a higher level in DAS management were aware and approved of various timeline extensions and other decisions related to the SAC software project. The most obvious example of this is Plaintiff's Exhibit 60, a signed letter dated November 27, 2000, from DAS Director C. Scott Johnson to Mary Leonard, President of the State Controlling Board, which reads as follows:
Dear President Leonard:
Please consider the Department of Administrative Services request for a non-substantive change to its contract with Systems Automation (T I #52-0889870).
The Department initially used authority granted on September 14, 1998 under Controlling Board Request DAS102 to contract with Systems Automation. In FY 2000, the Director of Budget and Management, under authority given him in Section 9.05 of House Bill 283, cancelled the balance remaining on the encumbrance ($1,411,714.00) and re-established it in Fiscal Year 2000. We request a nonsubstantive change to allow us to split this amount between Fiscal Years 2000 and 2001 as follows:
Fiscal Year 2000 $501,810.00
Fiscal Year 2001 $909,904.00
Please contact Peter Coccia, DAS Finance Administrator, at 644-7340 if you need additional information about this request.
Sincerely,
/s/ C. Scott Johnson
C. Scott Johnson Director
 {¶ 23} This letter, sent long after DAS's argued termination date of the contract, makes no mention of any expiration of the contract over one year earlier, specifically refers (in the present tense) to DAS having a contract with SAC, further refers to a funding change requested during fiscal year 2000 by the director of budget and management with regard to the project, and seeks a non-substantive change to split amounts between fiscal years. The letter indicates that Johnson was aware of the project, was aware that the project was on-going, and sought a non-substantive change to split amounts between fiscal years and to be certain it was properly funded. This letter, admitted into evidence without objection by DAS, negates any argument by DAS that its lower-level personnel were continuing to perform on a terminated contract without the consent or knowledge of the DAS director.
 {¶ 24} Even if DAS employees initially lacked the statutory authority to renew the contract, Plaintiff's Exhibit 60 and other communications, such as letters from Bishop and Jackson, would appear to have served to ratify the actions of the employees. InMonarch Constr. Co. v. Ohio School Facilities Comm.,150 Ohio App.3d 134, 2002-Ohio-6281, this court determined that contracts made on behalf of the state by allegedly unauthorized persons were voidable, not void ab initio, and could be ratified. In so holding, we quoted State v. Exr. of Buttles (1854),3 Ohio St. 309, which stated, at ¶ 53:
* * * "When the agents of the State exceeded their authority, the State had its option to ratify their acts or repudiate the contract they had made in its name; but when it elected to ratify, it assumed all the obligations of the contract from its reception, and was entitled to all its benefits. If the State could have lawfully made the contract at the time and under the circumstances it was made, it could lawfully adopt the one made in its name by those who assumed to act as its agents. * * * In short, any contract that an individual, or body corporate or politic, may lawfully make, they may lawfully ratify and adopt, when made in their name without authority; and when adopted, it has its effect from the time it was made, and the same effect as though no agent had intervened." * * *
Thus, even if DAS employees lacked the authority to renew the contract at the time, later actions by DAS management served to ratify their acts.
 {¶ 25} Contrary to DAS's assertions regarding the apparent authority of its operatives, the real issue in this case appears to be that the contract itself, while specifically requiring "written notice" by "the state" in order for renewal to occur, does not define what sort of writing would constitute "written notice," nor does it define what person or persons would be authorized to bind "the state" in issuing such a writing. DAS argues that, because the contract generally provides that any renewal would be upon "the same terms, conditions, and pricing," only a written notice signed by the director of DAS (as occurred at the contract's initiation) would have sufficed to renew the contract. However, the contract does not specifically provide this, and a more persuasive interpretation is that, once the contract was signed, the DAS director was statutorily authorized to appoint persons to represent DAS in administering its terms, and that actions and communications by the DAS director and other DAS management in support of the contract could ratify the actions of its employees.
 {¶ 26} Contracts should be interpreted so as to carry out the intent of the parties, which is evidenced by the contractual language. Burlington Resources Oil Gas Co. v. Cox (1999),133 Ohio App.3d 543. Where the contract is silent, the parties are required to use good faith to fill the gap. Id. "Good faith" has been defined as an "`implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.'" Ed Schory Sons, Inc. v.Soc. Natl. Bank (1996), 75 Ohio St.3d 433, 444, quoting Kham Nate's Shoes No. 2, Inc. v. First Bank of Whiting (C.A.7, 1990),908 F.2d 1351, 1357-1358. Government contracts are not exempt from the requirement of good faith and fair dealing, and where evidence suggests that the parties were in mutual understanding about the contents and performance of a contract, government may not take advantage of an "ultratechnical construction" of a statutory requirement. See State ex rel. Uible v. Harlan
(1930), 37 Ohio App. 222, 226-227. ("It would seem strange that when all the county officers openly admit the mutual understanding that the contract was to be let upon a unit price basis, and there is not the slightest question that the county received full value for the excess amount requested, and there is not the slightest hint of fraud in the whole transaction, the county should not in all justice pay for what it received and not be permitted to take advantage of an ultratechnical construction of section 6945, General Code. We cannot conceive that the Legislature intended any such result in enacting this provision.")
 {¶ 27} Addressing a government entity's failure to abide by terms of its own collective bargaining agreement, the Ohio Supreme Court, in Warren Edn. Assn. v. Warren City Bd. of Edn.
(1985), 18 Ohio St.3d 170, 175, sharply criticized the view that the contractual obligations of a public agency are somehow exempt from the law of contracts:
* * * Public agencies should be aware that their agreements are as sacrosanct as those made between strictly private parties. Public agencies, like those in the private sector, are bound by the agreements made by those who negotiate on their behalf. Such agreements are not subject to the subsequent whims and caprices of the public agency or its members. This court should not, and indeed will not, tolerate eleventh hour specious challenges to agreements made by public agencies after they have negotiated and have given their word.
 {¶ 28} We agree with the trial court that the contract was given full effect by the actions and communications of DAS (both management and employees), and DAS was required to compensate SAC for all accepted deliverables plus retainage.
 {¶ 29} Based upon these considerations, DAS's assignment of error is overruled, and the judgment of the Ohio Court of Claims is affirmed.
Judgment affirmed.
Lazarus, P.J., and Deshler, J., concur.
Deshler, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] In reviewing the language of this contract, we note an apparent contradiction in terms in that the contract states that: "The term of state of Ohio contracts may cross the state biennium," while also indicating that because of this the contract must terminate on June 30, 1999. We can only conclude that this must be a typographical error, and the drafter meant to say that state contracts may not cross the state biennium and for purposes of this opinion will read the contract as drafted in that manner. A further problem is that the contract appears to contain mutually exclusive terms. On the one hand it indicates that it terminates June 30, 1999, but, on the other, it incorporates by reference a timeline which extends six months past the express date of termination, and further states that the contract "remains in effect until the work described in Exhibit I is completed to the satisfaction of the State and the Contractor is paid in accordance with the Article entitled `Payment Schedule.'" The trial court interpreted these clauses, and other pertinent communications between the parties occurring before July 1, 1999, as indicating that the contract was renewed by DAS prior to the end of June 1999, stating: "Thus, DAS not only approved a time-line that extended well beyond June 30, 1999, it also directed SAC to continue working on the project over the ensuing 18 months."
This reading of the contract would appear to create an automatic renewal because the contract itself, signed prior to June 30, 1999, contemplated that completion would not occur until after the contract terminated, and incorporated a timeline extending past the termination deadline. In any event, neither of these issues appear to have affected the parties' initial performance. After drafting and signing the written document, the parties promptly ignored many of its terms, and relied instead upon a series of written and oral agreements intended to keep the project going while addressing various delays, disputes and problems.